In re William D. APPLER, Respondent,
A Member of the Bar of the District
of Columbia Court of Appeals.

No. 93–BG–1644.

District of Columbia Court of Appeals.

Argued April 5, 1995.

Decided Dec. 29, 1995.

Julia L. Porter, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, and Wallace E. Shipp, Jr., Deputy Bar Counsel, were on the brief, for the Office of Bar Counsel.

Mary G. Clark, with whom Allen P. Waxman and Philip B. Busch, Washington, DC, were on the brief, for respondent.

Maureen Duignan, Thomas B. Leary, Thomas Earl Patton, and William D. Kingery, Jr., Washington, DC, were on the brief, for The Lawyer Counseling Committee, amicus curiae.

Ronald S. Honberg, Rockville, MD, and Paul L. Perito, Washington, DC, were on the brief, for the National Alliance for the Mentally Ill and the National Depressive and Manic–Depressive Association, amici curiae.

Before TERRY and STEADMAN, Associate Judges, and TAYLOR, Associate Judge of the Superior Court of the District of Columbia.*

Statement by Associate Judge STEADMAN, concurring in the result, at p. 742.

TAYLOR, Associate Judge:

This case is before the court on a Report and Recommendation of the Board on Professional Responsibility (the Board Report). Respondent was charged in Docket No. 152–91 with violating Disciplinary Rules 1–102(A)(3) (engaging in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law) and 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and D.C.Rules of Professional Conduct 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). Respondent was also charged in Docket No. 145–92 with violating D.C.Rule of Professional Conduct 1.7(b)(1) (representing two clients whose interests conflict).

A Hearing Committee of the Board on Professional Responsibility held a consolidat-

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1989).

ed hearing on the two cases and issued its Findings of Fact, Conclusions of Law and Recommended Sanction (Hearing Committee Report), holding that although respondent's actions violated all of the cited rules, sanctions should be mitigated under our so-called *Kersey* doctrine. *In re Kersey*, 520 A.2d 321 (D.C.1987). Thus, the Hearing Committee recommended disbarment in Docket No. 152–91 and a 90–day suspension in Docket No. 145–92. It further recommended suspending execution of both those sanctions and placing respondent on three years probation with certain conditions. The Board on Professional Responsibility (the Board) reviewed the Committee's findings. On December 7, 1993, the Board issued its Report, rejecting the Committee's recommendation and instead recommending disbarment.[1] Respondent now contends that (1) the Board improperly discounted certain expert testimony relating to his bipolar illness and narcissistic personality disorder; and (2) the Board did not give adequate deference to the Hearing Committee's finding that respondent's bipolar illness caused his misconduct. Although we do not agree with certain of the Board's findings and conclusions, we now adopt the Board's ultimate recommendation and order that respondent be disbarred in Docket No. 152–91. We also order that respondent be suspended for 90 days, concurrently, in Docket No. 145–92.

1. Rather than delineating separate sanctions in each case, as the Committee had done, the Board simply recommended that respondent be disbarred.

2. The Hearing Committee report provides a lengthy excerpt from the description of the manic phase of bipolar disorder contained in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d rev. ed. 1987) (DSM–III–R). That excerpt states in part:

The essential feature of a Manic Episode is a distinct period during which the predominant mood is either elevated, expansive, or irritable, and there are associated symptoms of the Manic Syndrome. The disturbance is sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to require hospitalization to prevent harm to self or others. Hearing Committee Report at 22, quoting DSM–III–R at 214–216.

## I.

### A. *Respondent's legal, medical and personal history*

Respondent was admitted to the District of Columbia Bar in 1975. Before the incidents that form the subject of this decision, he apparently had no legal or professional conduct problems.

In 1983, however, respondent noticed that he was engaging in numerous strange behaviors. For example, he was placing and withdrawing newspaper classified ads, and signing and canceling leases for office space for no known reason. Although he had by then been married to Kathy Appler for 17 years, in November of 1983, respondent began an affair with Deborah, a former college sweetheart who lived in California. He would often make expensive trips from D.C. to California for the weekend, sometimes stepping off the plane dressed in a tuxedo, ready to take Deborah dancing. According to all accounts, this was totally out of character for respondent. In December 1983, respondent left his wife. In that same month, respondent sought psychiatric help and was diagnosed with bipolar disorder. Bipolar disorder, also known as manic depression, is characterized by symptoms that range from acutely manic behavior on one extreme to severe depression on the other extreme. Hearing Committee Report at 21.[2] For approximately 15 months, respondent

The Committee went on to discuss hypomanic behavior, a less extreme form of behavior that nevertheless exists on the manic side of normal behavior. The Committee quotes Dr. Frederick K. Goodwin, who submitted an affidavit on behalf of respondent post-hearing:

[T]he hypomanic attorney may approach his cases with an extremely high level of energy, confidence and/or aggression. However, the aggression and risk-taking which may serve the hypomanic individual well in one area, may be destructive in other areas, such as extramarital affairs, bad financial decisions and illegal activities. In either instance of "good" or "bad" conduct, the hypomanic rarely pauses, of his own volition, to reflect on his judgment. Rather he impulsively acts and, typically, does so—whether the conduct reflects good or bad judgment—with the skill consistent with his inflated sense that he can accomplish anything.

Hearing Committee Report at 25 (citation omitted).

engaged in therapy and was prescribed the drug lithium.[3]

Because of his expertise in Food and Drug Administration (FDA) matters, in December 1984 respondent was hired by the law firm of McDermott, Will & Emery (McDermott); he was made an "income partner," *i.e.*, one who earns a set salary rather than sharing in the profits. Respondent expected that he would eventually be made a capital partner.

In February 1985, respondent divorced his wife. The following month, he discontinued his therapy against his doctor's advice. Shortly thereafter, in May 1985, respondent married Deborah. He soon stopped using the lithium, too, at least in part because of his new wife's concerns about certain of the medication's side effects.

In 1986, respondent had still not been made a capital partner; that same year, he started engaging in the misconduct that underlies this case.[4]

### B. *Respondent's Misconduct*

#### i. *Docket No. 152–91*

Starting in 1986, respondent asked several of his clients to pay him for legal services directly, rather than paying McDermott. His first direct billing arrangement was with Local 15, International Union of Operating Engineers. In 1988 he expanded his scheme to include BioClinical Systems, Inc., adding Chronodynamics in 1989, Farma Foods in 1990 and, finally, Modern Packaging, Inc. in 1991. In all cases except Farma Foods, respondent would bill the clients for his services directly, without giving any of the proceeds to McDermott. In the case of Farma Foods, where other McDermott attorneys were also working on matters for the client, respondent billed for his own services separately, and had Farma's managing director send two checks, one payable to respondent and one to McDermott.[5]

In all five cases, respondent carried out the direct billing with the full cooperation of the client in question, even though the clients knew that McDermott was being kept in the dark. In the case of Farma, which was headquartered in Denmark, the managing director not only agreed not to tell McDermott of the arrangement, but also agreed to hide the scheme from his own manager of U.S. operations. By the time respondent was caught in 1991, he had cheated his firm out of more than $1.1 million dollars. Board Report at 3.

Although most of respondent's billing misconduct involved direct billing, in the case of Farma he also engaged in double-billing and billing for personal expenses. In an apparent effort to prevent either fee or expense amounts from ever appearing excessively high, respondent manipulated them both—shifting fees to expenses and expenses to fees, as necessary. To prevent this fee and expense shifting from causing any change in the aggregate amount of the bill, respondent sometimes spent more than two hours preparing a "normal-looking bill." Hearing Committee Report at 12.

In the end, it was this fee and expense shifting, and not the direct billing, that lead to respondent's downfall. Respondent was finally caught in February 1991, when a secretary noticed, and reported to McDermott,

---

3. Bipolar illness, apparently caused by a chemical imbalance in the brain, is often treated with lithium carbonate tablets. In the right dose, the lithium can rectify the imbalance. Generally, it takes time before the correct dosage of lithium can be ascertained. Even after the right dosage is found, the patient must be continually monitored. Hearing Committee Report at 37.

4. Although respondent initially claimed that he committed the misconduct because McDermott did not promote him, he ultimately recanted that claim. The Hearing Committee accepted this recantation, finding that—in any event—the misconduct started nearly a year *before* respondent was told he would not be promoted. Hearing Committee Report at 41.

5. Although respondent denies that there was any great complexity to the scheme, the facts found by the Hearing Committee suggest quite an involved and carefully thought-out process. For example, respondent had most of the payments mailed directly to his home, so that his secretary would not see them; he also forbade his secretary to open any of his mail, just in case any checks *did* come to the office. Respondent also spent many hours typing up facsimile legal bills to present to the clients, himself, rather than having his secretary do them. And, of course, he kept all the records for the bills at his home.

that respondent had not credited Farma for an unused airline ticket. Respondent agreed to reimburse McDermott for the value of the ticket. *Id.*

■ A month later, McDermott discovered the direct billing of Farma. On March 25, 1991 the firm fired respondent and told him they would report his misconduct to the appropriate authorities. At that time, respondent admitted for the first time his direct billing of clients other than Farma, but refused to identify them without speaking to his attorney. His attorney subsequently informed McDermott that respondent wished to self-report his misconduct to the Board. McDermott acquiesced and, on April 2, 1991, respondent reported the misconduct that formed the basis for Docket No. 152–91.[6] It was not, however, the end of respondent's misconduct.

### ii. Docket No. 145–92

In August 1990, respondent had once again consulted a psychiatrist. In February 1991, around the time that McDermott discovered the fee shifting, respondent returned to the psychiatrist who had treated him in 1983–85, Dr. Barton Kraff. As he had in 1983, Kraff diagnosed respondent with bipolar disorder. This time, however—and for the first time—Kraff also diagnosed narcissistic personality disorder [7] *and* alcohol abuse, both of which he believed were caused by the bipolar disorder. Hearing Committee Report at 34. Kraff once again started respondent on a regimen of lithium. Dr. Kraff testified, and the Hearing Committee found, that he did not find an effective dosage of lithium for respondent until late 1991.

In June 1990, while he was still with McDermott, respondent had been retained by Biodyne, Inc. to assist with an FDA mat-

ter. Respondent's contact with Biodyne was Elizabeth Melaragno, its general manager who was also a minority shareholder in the company. Hearing Committee Report at 15. In November 1990, respondent and Melaragno began an affair that lasted until May 1991. As a result of their personal relationship, respondent started advising Melaragno about matters relating to her employment with Biodyne, his client. Some of these matters placed Melaragno in an adverse position to Biodyne and its president, Dr. Charles Kerber. On May 2, 1991, shortly *after* he self-reported his billing misconduct, respondent attended a meeting where Melaragno tendered her resignation to Biodyne. *Id.* At the meeting, respondent presented Kerber with a list of issues Melaragno wished to raise and informed Kerber and Biodyne's general counsel, John O'Neill, that any contact with Melaragno should be made through respondent. Later on, because of complaints by Kerber, respondent agreed to refer Melaragno to other attorneys. Nevertheless, he continued to involve himself in the matter by offering to mediate, and even suggested that if Biodyne dropped certain claims it had against Melaragno, he would provide FDA services to Biodyne gratis. In late 1991, Biodyne filed suit against Melaragno. In January 1992, respondent filed a response on Melaragno's behalf. As a result, in February, Kerber reported respondent to the Board, leading to the conflict-of-interest charges in Docket No. 145–92.

### iii. Hearing

The Hearing Committee heard testimony on both cases over a period of six days in

---

**6.** Criminal proceedings were never instigated against respondent in connection with the billing misconduct. Had respondent been criminally convicted for this misconduct, there would be no doubt that disbarment would be the appropriate sanction. *See In re Fox,* 627 A.2d 511 (D.C. 1993). Respondent apparently avoided criminal prosecution by reaching a settlement with McDermott. As of March 1993, respondent had paid more than $400,000 to reimburse McDermott's insurance company, and was ahead of his payment schedule. He had also paid $15,000 to reimburse McDermott for the meals and person-

al expenses he had improperly charged to the firm and its clients.

**7.** Narcissistic Personality Disorder is manifested by an exaggeration of traits that in fact exist in many of us. The Hearing Committee found:

A person with this disorder manifests "grandiosity, a sense of self-importance, of self-worth, a sense of being able to do pretty much what one wants to do, [along with] a sense of entitlement that is beyond what is common."
Hearing Committee Report at 26.

March–May 1993. Because respondent had largely stipulated to the facts constituting the charged offenses, most of the evidence presented related to respondent's *Kersey* defense.[8] Essentially, respondent tried to prove that his bipolar illness caused the offending conduct and that he was rehabilitated. Several experts testified, including Dr. Kraff, respondent's treating psychiatrist, and Dr. Raymond Patterson, former Director of the Forensic Programs Division of Saint Elizabeth's Hospital. Dr. Kraff concluded that the bipolar illness caused respondent's misconduct; although less definitive, Dr. Patterson concluded that bipolar disorder was a substantial factor in bringing that misconduct about.

When asked about the connection between respondent's bipolar disorder and the two misconduct cases, Dr. Kraff testified:

I absolutely believe in both circumstances [respondent] would not have done what he did if not for the bipolar disorder, and I feel like I can say that with a kind of a certainty that I feel because of the experience with him in the mid–80s. This is so out of character, you know, for the first 45 years of this guy's life.

While Dr. Kraff expressed certainty that the disorder caused the misconduct, however, he was not as certain that respondent would not relapse. On cross-examination, when asked if respondent might resume his prior behavior, Dr. Kraff answered:

I think there is a yes and a no to it. I think Bill is genuinely more, infinitely more aware about his disabilities and grows increasingly a believer about the need for him to take lithium and abstain from alcohol.

However, if you were asking me would I be willing to bet the farm, you know, that Bill Appler won't relapse, the answer is no. But I have to tell you the same is true for

most of the people I treat. Bill Appler has [a] life long illness and he could relapse.

Later, Committee Chairman Hart also inquired about the likelihood of relapse. Dr. Kraff responded:

I'll tell you what I hope. I hope that this Committee will keep him in the fish bowl, if you will, by requiring monitoring of his serum Lithium and maybe alcohol ... and I think that if that is done that there is almost no likelihood that there will be a recurrence.

■ Bar Counsel's main expert, Dr. Patterson, examined Appler on several occasions, and also discussed his case with Dr. Kraff. Patterson obviously had great respect for Dr. Kraff's opinion, especially since Kraff had a much longer history of examining and treating respondent. Nevertheless, Patterson could not conclude that the bipolar disorder alone was the substantial cause of the billing misconduct.[9] Indeed, on several occasions during his testimony, Patterson explained that it was hard to distinguish between narcissism and bipolar illness as the cause of the misconduct.[10]

[CHAIRMAN HART:] [T]o what extent do you see the problem here as being the narcissistic problem as opposed to the bipolar problem?

[DR. PATTERSON:] That's the tough call for me, and quite honestly I think if someone were to say they could distinguish it very clearly that that would be difficult for me to accept only because of not having the face to face or the hands on or the current relationship during that time period.

[I]f it were not for Dr. Kraff's having seen him before I would have a much greater difficulty with believing that a bi-

---

8. See the discussion of the *Kersey* line of cases, below.

9. Patterson's opinion regarding the cause of the conflict misconduct is unclear. At one point, he testified that respondent's willingness to "go up against the company that he [was] representing on [Melaragno's] behalf" was more consistent with narcissistic personality disorder than with bipolar illness (HCP 3/25:111–12). But he later testified that he felt that the conflict episode was "much more ... along the line of the bipolar disorder" (HCP 3/25:157).

10. This distinction is important. Bipolar illness takes away some degree of control and thus, in the right circumstances, could be cause for mitigation. A person suffering from narcissistic disorder maintains the ability to exercise volition and thus would seem to have a harder time raising a *Kersey* defense. See HCP 3/25:156–57. Because we ultimately find that bipolar disorder was a substantial cause of the misconduct in this case, however, we need not reach the issue of whether narcissistic personality disorder can be grounds for *Kersey* mitigation.

polar disorder existed for that period of time and did not come to treatment and did not cause there to be such dysfunction that the job performance was off.

At another point, Patterson described respondent's bipolar disorder, narcissism and alcohol use as "com[ing] together and in some ways feed[ing] each other."

On the question of relapse, however, Dr. Patterson's conclusions were very similar to Dr. Kraff's:

> Unless there is some external control and external standard that has to be adhered to, then I would have much less confidence that Mr. Appler would continue with medication or in treatment because there would be very low investment in it for him.... [T]here are folks certainly who are on their lithium and doing well and suddenly have a manic episode. So it's not beyond the realm of possibility that it could happen, but it's much less likely to happen if monitoring is very tight.

At one point in his testimony, Dr. Patterson also suggested that even with monitoring, it may not be safe for respondent to practice as a solo practitioner: "If it were an impaired physician, for example, then there would be a great deal of hesitancy to allow that physician to practice independently."

### C. *Committee and Board Recommendations*

The Hearing Committee ultimately found that all the counts charged in Docket No. 152–91 had been proven by clear and convincing evidence, in that respondent had committed "actions [that] were fraudulent and deceitful as to both [McDermott] and the affected clients, and [that] reflect[ed] adversely upon Respondent's fitness to practice law" (Hearing Committee Report at 18–19). Similarly, the Committee found that the count charged in Docket No. 145–92 had also been proven by clear and convincing evidence, in that respondent had "represented a client whose position conflicted with that of another client" (Hearing Committee Report at 20). The Committee subsequently concluded that the appropriate sanctions for those violations were disbarment in Docket No. 152–91 and a 90-day suspension in Docket No. 145–92.

Having found that all the expert testimony presented by the parties was credible, the Committee then conducted its *Kersey* analysis. It found, "but barely so," that respondent had met all of his burdens: proving by clear and convincing evidence that he had bipolar disorder; proving by a preponderance of the evidence that that disorder "affected his behavior substantially enough to satisfy the causation test for this purpose"; and proving by clear and convincing evidence that he had been "adequately" rehabilitated (Hearing Committee Report at 40–42).

Once these findings were in place, the Committee moved on to mitigation and recommended that execution of the sanctions in both cases be suspended and that respondent be placed on three years probation. That probation was to include numerous detailed conditions, including: continuation of medical treatment under Dr. Kraff or a Board-approved physician; continued use of lithium; submission by Dr. Kraff of quarterly reports detailing respondent's medical condition, compliance and prognosis; abstinence from alcohol; continuation of restitution payments; monitoring of respondent's professional conduct by a Board-approved attorney, with quarterly reports by that attorney to the Board and Bar Counsel; retainment of a Board-approved accounting firm to examine client billings on a quarterly basis; and, after probation ends, semiannual submission of medical reports to Bar Counsel "as long as he is a member of the District of Columbia Bar" (Hearing Committee Report at 47–48).[11]

By a vote of 6 to 3, the Board on Professional Responsibility rejected the Hearing Committee's finding that the bipolar disorder "substantially affected" respondent's profes-

---

11. In a footnote, the Committee noted that it was "unsure" whether the Board had the legal authority to impose the last condition, but that all parties had agreed that respondent was suffering from a "lifetime affliction," and that post-probation reports were the best way to assure that he continued to use lithium. Hearing Committee Report at 48 n. 23.

sional conduct.[12] The Board reached this conclusion on the basis of several factors. *First,* the Board considered the definition of bipolar disorder provided by DSM–III–R and the various experts, and concluded that respondent's ability to continue a successful law practice while he was committing the misconduct did not fit within that definition. *Second,* rather than accepting unanimous expert testimony to the contrary, the Board "perused" a treatise on bipolar disorder and narcissistic personality disorder (Board Report at 37) and concluded that respondent's behavior was consistent *only* with the narcissistic personality disorder and not with the bipolar disorder. *Third,* the Board decided that the testimony of Dr. Kraff, which had most strongly favored the hypothesis that respondent's misconduct was caused solely by the bipolar disorder, was biased.[13] *Finally,* the Board found that narcissistic personality disorder does not overcome volition and, thus, could not be a basis for mitigation. Having rejected mitigation, the Board recommended that respondent be disbarred.

## II.

Our standard of review for these cases appears in D.C.Bar R. XI, § 9(g), which provides that—as a general rule—this Court:

> shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.

*See also In re Temple,* 629 A.2d 1203, 1207 (D.C.1993) (*"Temple II"*).

■ The Board on Professional Responsibility must also meet certain standards when it is reviewing Hearing Committee recommendations. Even when it modifies a rec-

ommendation, the Board must give deference to the Hearing Committee's "subsidiary findings of basic facts." *In re Micheel,* 610 A.2d 231, 234 (D.C.1992). The Board need not give any deference, however, to the Hearing Committee's " 'ultimate facts' which are really conclusions of law." *Id.* "Subsidiary facts" include, but are not limited to, the credibility of witnesses. *Id.* at 234; *Temple II, supra,* 629 A.2d at 1208.

■ Once the Committee, Board or Court has concluded that a respondent has committed the alleged misconduct, it must consider sanctions. Sanctions in such cases are not meant to be punitive. *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc). Rather, they are meant to protect the public, deter other attorneys from engaging in similar misconduct and protect public and private rights. *Kersey, supra,* 520 A.2d at 327. We have made it plain "that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc); *see also Micheel, supra,* 610 A.2d at 236.

In *In re Kersey, supra,* and its progeny, however, we have recognized certain situations where the most egregious misconduct may qualify for mitigation. In *Kersey,* for example, an attorney proved that his misconduct was caused by his alcoholism and that he had largely recovered from that disease. In such cases, we have acknowledged that discipline or threatened discipline would not have deterred Kersey, or other attorneys, from misconduct. Thus, we have concluded that mitigation may be appropriate if it will still allow for the protection of the public, and of public and private rights.

■ Before we will consider mitigation, however, the attorney found to have engaged

---

12. The Board's findings of fact, analysis and conclusion focused on the question of mitigation. Its finding on the question of respondent's actual misconduct appears to have been limited to the simple statement that "the facts concerning Respondent's criminal conduct are undisputed," *followed* by a recitation of those facts. The Board never made a specific finding that respondent violated the Code of Professional Responsi-

bility and Rules of Professional Conduct, as charged.

13. The Board reasoned that since Dr. Kraff was respondent's treating physician, he had an overriding interest in having respondent escape with the lightest possible sanction(s).

in misconduct must prove that he suffered from a medical condition that "substantially affected" his conduct and that he has been "rehabilitated" from that condition. *Kersey, supra,* 520 A.2d at 327. The condition need not be the "sole cause" of the misconduct; rather the attorney must prove that "but for" that condition, he would not have engaged in the misconduct. *Id.*; *In re Temple,* 596 A.2d 585, 590 (D.C.1991) (*"Temple I "*). Although these cases should be considered on an individual basis, *Kersey, supra,* 520 A.2d at 327, since *Kersey* we have mitigated sanctions for attorneys suffering from chronic depression, *In re Peek,* 565 A.2d 627 (D.C.1989), and from bipolar disorder, *In re Larsen,* 589 A.2d 400 (D.C.1991) (where respondent misappropriated approximately $2,000 from a single client in a single incident of misconduct).[14] In all cases where we have chosen to mitigate, we have done so in the belief that the attorney no longer posed a significant risk to the public.

### III.

We accept the Committee and Board conclusions that respondent committed the charged misconduct. We also agree that a *Kersey*-style analysis was appropriate. We do not agree, however, with the Board's approach to this analysis, or with either panel's ultimate conclusion.

#### A. *Causation*

The Board's approach in reviewing the Hearing Committee was to question the credibility of Dr. Kraff, and draw on narrow portions of Bar Counsel's experts' testimony and thus conclude that respondent did not prove by a preponderance of the evidence that the bipolar illness "substantially affected" his professional conduct. This approach was erroneous.

■ The Board owes no deference to the Hearing Committee in making determinations that have clear legal consequence (*e.g.,* whether the bipolar condition caused the misconduct) and, thus, may review those deter-

minations *de novo.* As noted, however, questions of credibility are subsidiary facts and should be left to the Committee. Therefore, the Board must conduct its *de novo* review in the context of the Hearing Committee's findings of subsidiary facts and its findings as to the credibility of witnesses—it cannot go beyond the record or simply ignore witnesses whom the Committee has found to be credible.

■ Reviewing the Hearing Committee's findings of subsidiary fact and the hearing record, we conclude that there was *no* significant evidence of record that could have led the Board majority to find that respondent had not met his burden to prove that the bipolar condition substantially affected his conduct. In reaching this finding, the Board relied solely on generalized definitions of bipolar illness's symptoms, as described in DSM–III–R and by the various experts. The experts testified, and the Committee concluded, however, that even though respondent's behavior differed from that of the average bipolar sufferer, certain key factors—respondent's prior history of honest behavior; the fact that the timing of the misbehavior coincided with the timing of the untreated disorder; respondent's lack of insight into the wrongfulness of his conduct; and respondent's lack of concern for the consequences of his actions—led them to believe that the disease did significantly affect his conduct. The Board offered no sufficient reason for disscounting this testimony and could point to no countervailing expert testimony suggesting that the bipolar disease did not substantially affect respondent's conduct. Therefore, we conclude that the Board's finding on this question is "unsupported by substantial evidence of record"[15] and we adopt the Hearing Committee's finding that respondent met his burden on the issue of causation.

#### B. *Rehabilitation*

■ Where we differ from the Committee

---

**14.** In *In re Larsen, supra,* we were adopting the findings of the Court of Appeals of Maryland in a reciprocal action.

**15.** *See* D.C.Bar R. XI, § 9(g), quoted at page 738, *supra.*

is on the question of rehabilitation.[16] In previous cases, we have focused our analysis on the question of causation. Yet we have emphasized that once causation has been established, "rehabilitation from [the] condition will be considered a significant factor in imposing discipline," *Kersey, supra*, 520 A.2d at 327, and "that where there is *significant* evidence of rehabilitation, a period of actual suspension is not always mandated." *Id.* (emphasis added). The reason for this, once again, is our recognition that an attorney should not be punished simply for punishment's sake. If the attorney no longer poses a threat to the public welfare, or if that threat is manageable and may be controlled by a period of probation, then disbarment or a period of actual suspension may be unnecessary.

The testimony of experts from both sides of this case raises a serious question whether there is "significant evidence" of respondent's rehabilitation, as *Kersey* requires. We recognize that in any such case, there exists a risk of relapse. It is for this reason that the Court in *Kersey* and its progeny have mandated lengthy periods of intrusive probation. Where this case differs, however, is in the undisputed absolute necessity of such intrusive probation to prevent a repetition of the misconduct, and in the continued, very real, potential for repeated misconduct even after any reasonable period of probation.

Respondent's own expert testified that it would be the continued monitoring by the Board that would likely prevent a relapse. The Board's expert, too, made it clear that a person suffering from bipolar disease could not be trusted to fight that disease without close monitoring. Neither expert suggested that, at the end of a probationary period, when monitoring ceases, respondent would suddenly have the ability to monitor his own compliance. Indeed, back in 1985, after respondent was first diagnosed with the bipolar

condition and had been stabilized on lithium, he chose to discontinue taking the lithium. While we certainly respect respondent's right to make personal medical decisions, this particular decision, and the lack of judgment that it reveals, fuel our concern that it will be repeated and lead to further misconduct.

The Committee tries to address the problem of the continuing nature of respondent's disease by suggesting "post-probation conditions." The Court rejects this as an option for two reasons. *First*, the rule only allows for a probationary period of three years [17] and, despite respondent's willingness to go along with what amounts to lifetime probation, we know of no authority for such a sanction. *Second*, even if post-probation monitoring were permissible, we are simply not willing to create what amounts to a cottage industry with its sole aim of monitoring this respondent's compliance. It is not reasonable to expect Bar Counsel, the Board or the Court to engage in a scheme of continual and endless monitoring, solely to accommodate respondent's desire to continue practicing law in the District of Columbia.[18]

We are further troubled by the fact that respondent carried on a complex course of misconduct for a period of some five years. During that entire period, none of respondent's co-workers and employees knew he had any type of illness, let alone suspected misconduct. Respondent's own wife told Dr. Kraff that she'd had no idea what had been going on and, indeed, was shocked to learn of her husband's billing misconduct. It is therefore not a frivolous concern that should respondent suffer a relapse, he could resume his misconduct and cause significantly more harm before he is found out once more.

To some extent, this latter concern puts respondent at a disadvantage to someone such as the respondent in *In re Larsen, supra*, who misappropriated $2,000, rather

---

16. Because the Board concluded that respondent's bipolar condition did not substantially cause the misconduct, it never reached the question of rehabilitation.

17. D.C.Bar R. XI, § 3(a)(7).

18. Neither would it be fair to other attorneys with bipolar illness but without respondent's apparent resources to allow respondent to continue to practice solely because he can afford to pay all of the doctors, attorneys and accountants necessary to maintain the Court's, the Board's, Bar Counsel's and the community's peace of mind.

than $1.1 million. Indeed, in some sense we are requiring greater evidence of rehabilitation from respondent because he did so much more harm. If our central aim is to protect the public, however, this does not seem an unreasonable burden. We want to limit the ultimate sanction of disbarment to cases where it is absolutely necessary, but we also want to assure the continued public trust.

Therefore, we cannot agree with the Committee's conclusion that respondent proved by clear and convincing evidence that he has been rehabilitated from the bipolar condition to the extent likely to prevent further misconduct. As a result, we decline to mitigate sanctions in this case.

## IV.

It is undisputed that William Appler engaged in a series of serious crimes, as defined by D.C.Bar R. XI, § 10.[19] The crimes are of a nature that this Court has repeatedly held involve moral turpitude—*i.e.,* felonies involving fraudulent and/or dishonest intent. *See, e.g., In re Slater,* 627 A.2d 508, 509 (D.C.1993); *In re Youmans,* 617 A.2d 534 (D.C.1993); *In re Bond,* 519 A.2d 165 (D.C.1986); *In re Willcher,* 447 A.2d 1198 (D.C.1982). Had respondent been convicted of those crimes in a court of law, the matter would have ended there: the sanction would have been disbarment, regardless of any mitigating factors. D.C.Code § 11–2503(a) (1995); *In re Fox, supra,* 627 A.2d at 512; *In re Hopmayer,* 625 A.2d 290 (D.C.1993); *In re Boyd,* 593 A.2d 183 (D.C.1991); *In re Colson,* 412 A.2d 1160 (D.C.1979) (en banc). *See also In re Zimmer,* 637 A.2d 103 (D.C.1994); *In re Mustafa,* 631 A.2d 45, 47 (D.C.1993). Happily for him, respondent was able to avoid criminal prosecution for his acts. But that does not change their character, or allay the concerns that moved Congress and the courts to impose the ultimate sanction for

such acts. That is why disbarment is still available as a sanction for an attorney's acts of moral turpitude, even though it is not mandated absent a criminal conviction. *In re Hopmayer, supra.*

By permitting respondent to remain a member of the Bar, we would be attesting that "he is [currently] fit to be entrusted with professional ... matters...." D.C.Bar R. XI, § 2(a). But William Appler systematically stole from his employer more than one million dollars, and inveigled his clients into cooperating with him toward that end. Ultimately, we are unable to entrust him with professional matters without adequate assurance that he will not, in the future, resume this—or some other, equally damaging—course of misconduct.

We are not without sympathy for Mr. Appler; at least for the time being, his bipolar condition will prevent him from continuing to practice law.[20] But respondent is not being disbarred because he suffers from bipolar illness; he is being disbarred because that illness caused him to commit serious, damaging crimes in the past, and we are not convinced that it will not likely cause him to commit similar crimes in the future. Therefore, even though our purpose is not to punish, we, unfortunately, cannot put our sympathies for an attorney's medical condition above the interests of the public at large.

Accordingly, we must accept the recommendation of the Board and order that, in Docket No. 152–91, respondent be disbarred from the practice of law in the District of Columbia and that, in Docket No. 145–92, respondent be suspended for 90 days from said practice, such suspension to run concurrent with his period of disbarment. Both

---

19. So far as relevant here, Rule XI, § 10(b) provides:

   *Serious crimes.* The term "serious crime" shall include (1) any felony, and (2) any other crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice ... misrepresentation, fraud ... deceit ... misappropriation, theft, or ... a

conspiracy or solicitation of another to commit a "serious crime."

20. There are of course numerous attorneys who suffer from bipolar disorder, but continue to practice law successfully and honestly. It is unfortunate for respondent that the condition's effect on him was to cause him to engage in this extremely damaging behavior.

those sanctions are effective 30 days from the date of this opinion.

*So Ordered.*

STEADMAN, Associate Judge, harboring doubts about the general scope and application of the elements of *Kersey,* concurs in the result.