**In re Jeanne ROBINSON, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

No. 98–BG–1194.

District of Columbia Court of Appeals.

Argued April 7, 1999.
Decided Aug. 19, 1999.

---

11. See note 10, *supra.*

Abraham C. Blitzer, Washington, DC, for respondent.

H. Clay Smith III, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, was on the brief, for petitioner, the Office of Bar Counsel.

Before STEADMAN and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

STEADMAN, Associate Judge:

Respondent Jeanne Robinson committed disciplinary violations that resulted in unnecessary incarceration of her client and failed to cooperate in Bar Counsel's subsequent investigation. The facts regarding the misconduct are stipulated. The only issue before us is one of sanction.

Respondent argues for disability-related mitigation under the doctrine of *In re Kersey*, 520 A.2d 321 (D.C.1987). On a remand from this court, both a Hearing Committee and the Board on Professional Responsibility (Board) concluded that respondent had not shown substantial rehabilitation. The Board recommends that respondent be suspended for sixty days, with a requirement of fitness.[1] Respondent asserts that she in fact met her bur-

---

1. This shorthand phrase is used here, as is customary, to refer to the requirements of D.C. Bar R. XI, § 16 that an attorney "required to furnish proof of rehabilitation" as a condition to reinstatement to the Bar shall show by clear and convincing evidence that the attorney "has the moral qualifications,

den of showing rehabilitation and also challenges the imposition of a fitness requirement for reinstatement. We adopt the recommendation of the Board.

## I.

The disciplinary case is before us for the second time and has an extended procedural history. In 1993, Bar Counsel filed a petition charging Robinson with violations of the following Rules of Professional Conduct: Rule 1.3(c) (failure to act with reasonable promptness in representing a client); Rule 1.4(a) (failure to keep client reasonably informed about the status of the case); Rule 8.4(d) (conduct which seriously interferes with the administration of justice); and D.C. Bar R. XI, § 2(b)(3) (failure to respond to Board order compelling a response). The charges stemmed from Robinson's neglect in her representation of a client in a criminal matter in which she failed to keep contact with the client, to file a bond review motion on his behalf, resulting in a lengthening of his jail stay, and to appear at a hearing, as well as Robinson's failure to respond to inquiries in the course of Bar Counsel's investigation. Bar Counsel and Robinson stipulated to the facts concerning her conduct and it was uncontested that the conduct constituted misconduct as alleged.

Robinson presented disability-related mitigation evidence that she suffered from dysthymia, a form of long-term depression, that the charged disciplinary violations would not have occurred but for her disability, and that her condition could be controlled with appropriate treatment of weekly psychotherapy.[2] On this basis, the Hearing Committee recommended a thirty day suspension, with execution stayed, and probation, but the Board disagreed that

rehabilitation had been established. Before us, Robinson proffered a further medical report and, at the Board's request, we remanded the case in 1996 by an unpublished order for further consideration of the issue of rehabilitation. Also following the Board's recommendation, we conditioned the remand with the requirements "that respondent be supervised by a practice monitor selected by the Board, and that she undergo counseling by a medical expert, acceptable to the Board, on a weekly basis, or less frequently if so recommended by the medical expert."[3]

The Board in turn remanded the matter to a Hearing Committee for specific findings as to whether Robinson established her rehabilitation by clear and convincing evidence. The Board further ordered that Robinson's practice be monitored by Richard L. Cys, Esquire, and that Robinson file with the Board within 14 days the name of a medical expert from whom she would receive counseling and file quarterly reports from such medical expert.

On remand, the Hearing Committee heard testimony from Dr. Michael Barnes, a psychologist who had testified in the original proceedings in 1994 that Robinson had dysthymia, in addition to personality characteristics such as passive/aggressive features and coping mechanisms that affected her functioning. According to Dr. Barnes' testimony at that time, Robinson's dysthymia resulted in her "procrastination, inefficiency, and unintentional forgetting," which caused her professional misconduct. At the remand hearing on April 9, 1997, Dr. Barnes testified that he did not think that Robinson any longer suffered from "the significant influence of dysthymia or passive/aggressive coping mechanisms that she initially suffered

---

competency and learning in law required for readmission" and that "the resumption of the practice of law by the attorney will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." *Id.* § 16(d). "If the petitioner is found fit to resume the practice of law, the Court shall enter an order of reinstatement, ..." *Id.* § 16(f).

**2.** Bar Counsel did not challenge Robinson's evidence at that time.

**3.** These were essentially the terms of the two-year probation that the Board had recommended be imposed on respondent after a suspension of 120 days, 60 of which would be stayed.

from," and that he did not think she was at risk for neglecting her responsibilities. The Hearing Committee "found Dr. Barnes' testimony inconsistent, incomplete, and unpersuasive," because it was based primarily on reports from Robinson and her attorney about her functioning; it did not address Robinson's behaviors on remand that seemed to indicate she was continuing to exhibit procrastination, inefficiency and unintentional forgetting; and it failed to persuasively explain how her dysthymia had suddenly gone away without therapeutic treatment.

Bar Counsel presented the testimony of Dr. Richard Ratner, a forensic psychiatrist, who testified that Robinson never had dysthymia, although she may have had an episode of a major depressive disorder at the time of her misconduct. He further testified that, if Robinson had had a major depressive episode, that episode had ended. Dr. Ratner also testified that Robinson had personality pathology including narcissistic, passive/aggressive, and obsessive compulsive characteristics, as well as evidence of an organic disorder.[4] He testified that he expected that the personality pathology had probably diminished between 1993 and 1996, although it was still present, and that the "organicity" might impact on Robinson's ability to practice law. Dr. Ratner concluded that Robinson was "mildly dysfunctional" as a result of the personality pathology and "organicity" and was "marginally capable of doing an adequate job," while noting that he would be concerned if she took on more cases (she had three active cases at the time). When informed for the first time that Robinson had failed to comply with the Board's remand order that she provide the

Board with the name of a treating medical professional and provide quarterly reports regarding her treatment, Dr. Ratner stated that this should cause the Committee some concern because Robinson should have either complied with the order or acted to change it, rather than just ignoring it.[5]

The Hearing Committee also received the reports of the practice monitor, Richard Cys, and took his testimony at a second hearing on May 13, 1997. Mr. Cys first met with Robinson on January 7, 1997 and at this time explained to her that she needed to have basic practice aids, including a calendar, case list, case files, and a way of keeping track of court dates and deadlines. He also suggested she obtain a phone to communicate with her clients and stressed that she should comply with the Board's order that she report on her treatment by a medical expert. Mr. Cys requested Robinson to bring a list of her current cases, her case files, and her calendar to their next scheduled meeting. Robinson failed to appear at their next scheduled meeting, later claiming a misunderstanding. At the next meeting on February 13, Robinson did not bring, as instructed, a list of her current cases, her current cases files, or a current calendar. Mr. Cys again stressed the importance of such basic practice aids and requested that she bring them to the next meeting.[6] At the next meeting on March 18, Robinson brought a list of her current cases, which Mr. Cys felt that she had prepared just before the meeting, but did not bring case files or a calendar. When Robinson reported that she could not find a calendar that was appropriate or inexpensive enough, Mr. Cys stressed the importance

---

4. Dr. Ratner described "organicity" to refer to the possibility of structural or biochemical change in the brain, which results in possible changes in thought processes, problems with memory, types of inaccuracy, fuzziness, and defects in abstract thinking.

5. Robinson contended in part that she did not have the money to pay for counseling treatment.

6. At this meeting, Mr. Cys also asked Robinson if she had missed any court appearances, and she replied that she had a trial on January 28, but that "[she] got up and got ready to go to court but [her] body just couldn't make it." She called the clerk and got a continuance. She stated that "to her knowledge" she had not missed any other court appearances, but could not explain why she was not certain.

of a calendar and that she could draw one by hand on blank paper. He also asked her to send him a copy of her list of cases, but she never did. Mr. Cys testified that he was concerned about Robinson's method of case management and that, although her manner of tracking cases and making scheduled appearances was minimally adequate given that she had only three active cases, if she took on more cases he worried that she would be at risk for violating the Rules of Professional Conduct.

Robinson also testified before the Hearing Committee at the May 13 hearing. The Committee found her testimony to be "disjointed," "troubling," and "convoluted." Robinson's explanation for not filing reports with the Board to document weekly counseling was that she did not have health insurance or money to pay for counseling and she could not find a provider with whom she was comfortable. She also explained her failure to comply with this part of the Board's order by stating: "[W]hen I got this notice in my folder, I read it very quickly. And, I really blew that Order, that part of the notice ." When asked why she did not file a motion with the Board regarding her difficulties in complying with the Order, she stated that "it didn't occur to [her]." Robinson could not show the Committee a 1997 calendar to keep track of cases.[7] When asked why she did not bring her current case files to meetings with Mr. Cys as he had repeatedly requested, Robinson replied that she "did not understand that he wanted to see the [current case] files ..." When asked why she did not send Mr. Cys a copy of her case list as requested, she said that she did not have the money to xerox and mail it to him and that "it's on my desk and it's—you know, I look at it and I say, 'Send this.' And it just doesn't get sent. I don't have a secretary to delegate it to." Robinson also admitted that she had not paid her Bar dues for several years and that she had practiced law while she had been administratively suspended. She paid her dues on May 12, 1997, the day before the hearing.[8]

Based on the testimony as well as the practice monitor's reports, the Hearing Committee concluded that Robinson failed to meet her burden of showing substantial rehabilitation. The Committee found that the conflicting medical testimony gave it "some pause in light of [its] initial findings in 1994." While concluding that Robinson did not currently suffer from major depression or dysthymia, the Committee found that "she still has personality pathologies and organic changes, according to Dr. Ratner, including obsessive/compulsive, narcissistic, and passive/aggressive features," and that "they appear to interfere with her ability to meet her obligations."[9] The Committee concluded that Robinson was "more than 'mildly dysfunctional,'" based not only on the medical testimony, which the Committee did not find clear and convincing, but also on factors that the Committee found to be more probative—Robinson's failure to meet her obligations to the court, the Board, and the practice monitor while the matter was pending before the committee, and her own testimony which the Committee found to be "unconvincing and vacillating excuses for her failures."[10]

7. She did show the Committee a blank spiral notebook that she had just purchased to make a calendar, but she had not yet drawn a calendar in the book.

8. Robinson also testified that she had finally arranged for telephone service which she said was to be installed the day after the hearing.

9. While not so explicitly stating, the Hearing Committee, which was charged on remand to make a determination only with regard to substantial rehabilitation, appears to have concluded based on the more extensive remand evidence that Robinson's original misconduct was not caused by the dysthymia alone but also was affected by the related personality pathologies.

10. The Committee report states in pertinent part:

We would have expected that a rehabilitated lawyer during this period would have made special efforts to comply fully with all orders from the Board and instructions from the practice monitor. But Respon-

The Board adopted the Hearing Committee's conclusion that Robinson was not substantially rehabilitated. While noting that the Committee found that Robinson's dysthymia or serious depression had abated, the Board found that the Committee did not err in concluding "that [Robinson's] condition was complicated by personality pathology and organic disorder" and in attributing Robinson's inability to "bring her conduct in line with the requirements of the Court, the Board and her practice monitor ... to her underlying, untreated personality and organic disorders." The Board Report further explained:

> The Hearing Committee refused to neatly separate Respondent's disorders into two categories—depression and other problems—then ignore the other problems on the grounds that depression alone caused the mitigation and has lifted. The Board agrees that such an approach would simplify Respondent's situation more than Dr. Ratner was willing to do and would ignore Respondent's difficulties in conforming her conduct with the expectations of the disciplinary system.

The Board recommends that Robinson be suspended for 60 days, with a requirement that she show fitness before reinstatement. Robinson takes exception to the Board's finding on remand that she was not substantially rehabilitated and the Board's recommended sanction on remand of a fitness requirement.

## II.

This court adopts the Board's findings of fact, unless they are unsupported by substantial evidence in the record, and adopts the Board's recommendation regarding sanctions "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g); see, e.g., In re Temple, 629 A.2d 1203, 1207 (D.C.1993). "In determining the proper sanction, our foremost concern is the need·to protect the public, the courts, and the legal profession." In re Steele, 630 A.2d 196, 200 (D.C.1993). "Our purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney; rather, it is to offer the desired protection by assuring the continued or restored fitness of an attorney to practice law." Id. See also, e.g., In re Appler, 669 A.2d 731, 738 (D.C.1995); In re Hutchinson, 534 A.2d 919, 924 (D.C. 1987) (en banc).[11]

In In re Kersey, supra, and its progeny, we have recognized certain limited situations where otherwise sanctionable misconduct may qualify for mitigation. In Kersey, for example, we concluded that an attorney proved that his misconduct was caused by his alcoholism and that he had substantially recovered from that affliction. Notably, we also concluded that from the nature of the problem, including self-denial, it was unlikely that the imposition of discipline in such cases would have a de-

---

dent persisted in her habit of ignoring her obligations, and she provided unconvincing and vacillating excuses for her failures. She did not seek counseling as she was ordered by the Court and the Board, stating she did not have the money but then claiming she overlooked the Order. She could not explain why she did not take any steps to apprise the Board of her financial problems and seek the Board's help. Instead, she ignored the obligation. She repeatedly ignored instructions from the practice monitor to find or draw a calendar, to show her active case files to him, and to send him her list of cases. We have no doubt that the practice monitor was clear and direct in his instructions, and Respondent either "unin-

tentionally forgot" these instructions or chose not to comply....

Her testimony before this Committee, rather than allaying any concerns about whether she was rehabilitated and able to meet her obligations, convinced us that she is not rehabilitated. Based on her testimony, her unsatisfactory explanations for her conduct, and her actions while the matter was on remand, we do not believe that she has demonstrated her rehabilitation or her ability to meet her professional obligations.

11. This is not to overlook, however, the significant protective role of sanctions as a deterrence to future misconduct by the attorney in question and others so situated.

terrent effect on other alcoholics. *See* 520 A.2d at 327. However, mitigation may be appropriate only "if it will still allow for the protection of the public, and of public and private rights." *Appler, supra,* 669 A.2d at 738. Thus, "[i]n all cases where we have chosen to mitigate, we have done so in the belief that the attorney no longer posed a significant risk to the public." *Id.* at 739.

■ So it is that an attorney claiming mitigation under the *Kersey* doctrine has the burden of proving rehabilitation by clear and convincing evidence. *See In re Stanback,* 681 A.2d 1109, 1115 (D.C.1996). Robinson contends that she has shown by clear and convincing evidence that she has been rehabilitated from the dysthymia or long-term depression that was originally found to have caused her disciplinary violations and hence no sanction should be imposed. This argument rests on an unacceptably narrow definition of substantial rehabilitation; that is, if the evidence shows that a specific condition that was originally determined to have been a cause of the misconduct in question has abated, that individual is "substantially rehabilitated," regardless of evidence indicating that because of other related factors there is serious doubt about that individual's ability to practice law in accordance with the rules of ethics.

■ The *Kersey* doctrine does not excuse misconduct, but rather may provide for mitigation of the sanction in certain cases where, at the minimum, "the attorney no longer poses a threat to the public welfare, or if that threat is manageable and may be controlled by a period of probation ..." *Appler, supra,* 669 A.2d at 740. The "substantial rehabilitation" prong of *Kersey* in essence imposes a sort of fitness requirement on an attorney who seeks mitigation of sanctions under this doctrine. In Robinson's case, although the Board adopted the Hearing Committee's finding that the dysthymia or other serious depression that originally was thought to be the cause of her misconduct may have abated, the Hearing Committee and the

Board did not believe that other possible contributory factors also had dissipated and that Robinson no longer poses a significant risk to public and private rights.

■ This case is unusual in that the Board has had a lengthy opportunity to review Robinson's conduct as a result of the remand of this case. We and the Board placed certain conditions on Robinson during the remand period, akin to probation. Both the Hearing Committee and the Board in effect found that Robinson failed at her probation by not adequately complying with the conditions of the remand, supporting a conclusion that threat from Robinson's conduct may not be adequately managed through a period of probation alone. Additionally, Dr. Ratner's testimony identified organic disorders and personality pathologies that existed at the time of the original misconduct and that continued to exist. The Hearing Committee concluded, based on Robinson's conduct during the remand, the practice monitor's reports, and Robinson's own testimony, that she continued to exhibit the same behaviors of that Dr. Barnes originally attributed to her dysthymia—"unintentional forgetting," procrastination, making excuses, and neglecting duties—that gave rise to her disciplinary violations. Of particular concern was Robinson's failure on remand to bring her conduct in line with the requirements of this court, the Board, and the practice monitor on remand, a time when she well knew her practice would be carefully scrutinized. Whether Robinson's behaviors were the result of dysthymia or some other form of serious depression, or instead resulted from organic and personality disorders, the Hearing Committee and the Board were justified in concluding that Robinson was not "substantially rehabilitated" because her conduct continued to call into question her ability to ethically represent her clients. Thus, we agree with the Hearing Committee and the Board that *Kersey* mitigation is not appropriate in this case because it will not guarantee "the

protection of the public, and of public and private rights." *Appler*, 669 A.2d at 738.

## III.

Having concluded that *Kersey*-type mitigation is not appropriate here, we turn to Robinson's contention that the Board's erred in recommending the imposition of a fitness requirement in addition to a sixty-day actual suspension.

■ "Although we have not yet undertaken to enunciate a precise standard as to when a fitness requirement should be imposed," we look to the guidelines for evaluating petitions for reinstatement. *In re Steele*, 630 A.2d 196, 201 (D.C.1993). *Accord In re Lewis*, 689 A.2d 561, 567 (D.C. 1997) (per curiam); *In re Chisholm*, 679 A.2d 495, 503 (D.C.1996). In assessing a petition for reinstatement the court generally considers:

> (1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

*Steele*, 630 A.2d at 201 (quoting *In re Roundtree*, 503 A.2d 1215, 1217 (D.C.1985). In considering whether to impose a fitness requirement, the court has considered whether the passage of the suspension period alone, without further evaluation, will leave the court uninformed or concerned with respect to the enumerated factors, thus indicating that substantial questions remain about respondent's fitness to practice law. See *id.* at 201–202).

■ The Board found that a fitness requirement is appropriate in this case in light of the *Roundtree* factors. The Board determined that Robinson's neglect was serious and that she had a prior disciplin-

ary history (factor 1), *see In re Robinson*, 635 A.2d 352 (D.C.1993); that she was uncooperative with Bar Counsel and violated remand conditions entered by the Board and court (factor 3); that issues remain concerning her rehabilitation (factor 5); and that her conduct since discipline was originally recommended (e.g., failing to follow her practice monitor's advice and develop an adequate system for case management and client communication) indicates that she does not clearly understand and accept that her conduct was wrongful (factor 2) nor has she taken adequate steps to prevent future neglect (factor 3). The Board's conclusions are amply supported by the record.

Circumstances which this court has found to support the imposition of a fitness requirement in cases of neglect and related violations include the following: (1) Indications of mental instability that have not been resolved. *See Lewis, supra,* 689 A.2d 561 (30–day suspension with requirement to show fitness before reinstatement for completely abandoning client in trial-level criminal proceeding, where attorney was seriously depressed at the time and never treated, even though attorney cooperative with Bar Counsel and no prejudice to client); *In re Lyles,* 680 A.2d 408, 418–19 (D.C.1996) (per curiam) (six-month suspension with fitness requirement where neglect of multiple clients, where no showing that attorney recovered from serious depression, no understanding of lapse in obligation to her clients, and other pending disciplinary complaints); *Steele, supra,* 630 A.2d at 201 (60–day suspension, restitution of legal fees, and fitness requirement where attorney acknowledged unidentified personal problems that adversely affected her emotional stability and caused her to neglect her client's case, and also her failure to cooperate with Bar Counsel investigation). (2) Failure to respond to or cooperate with disciplinary investigations and proceedings.[12] *See In re Siegel,* 635 A.2d

12. *Cf. In re Delaney,* 697 A.2d 1212, 1213–14 (D.C.1997); *In re Lockie,* 649 A.2d 546, 547 (D.C.1994) (per curiam) ("egregious failure to

cooperate" with Bar Counsel investigation standing alone supports imposition of fitness requirement in addition to suspension).

345, 346 (D.C.1993) (six-month suspension plus a demonstration of fitness in case of neglect and dishonesty, where respondent also failed to cooperate in any way with Bar Counsel during the entirety of the disciplinary process); *Steele, supra,* 630 A.2d at 201 (lack of cooperation one factor supporting fitness requirement).

*Steele* is most instructive for this case. In *Steele,* a case where the Board found respondent had neglected her client in a landlord-tenant action and engaged in conduct that seriously interfered with the administration of justice by not cooperating with Bar Counsel's investigation, the Board had recommended a 60 day suspension plus restitution of legal fees paid. The court held that a fitness requirement also be imposed. The court was concerned not only with Steele's neglect of a legal matter, but also her failure to cooperate with Bar Counsel, her failure to provide information to explain her misconduct, and her acknowledgment of unidentified personal problems that adversely affected her emotional stability and caused her to neglect her client's case, and concluded that it could not be reasonably assured of respondent's fitness to practice law without requiring her to demonstrate such fitness before resuming practice. 630 A.2d at 201. The court concluded that respondent's letters to Bar Counsel that her life had improved and she was now "more emotionally stable ...do not provide the court with reasonable assurance regarding her present ability to practice law. We cannot assume that the passage of time alone has been adequate to guarantee that respondent is now a reliable attorney." *Id.* Although Robinson has provided considerably more evidence regarding her mental health problems than Steele did, because of the finding that Robinson continues to have certain personality pathologies and "organicity" that affect her ability to adequately represent clients, as in *Steele,* there is no way to know whether the situation will change with the mere passage of the suspension period without a fitness requirement. Also supporting imposition of a fitness requirement, here, as in *Steele,*

Robinson had difficulties in responding to Bar Counsel inquiries, and, in addition, has failed to comply with Board and court orders during the remand period.

Accordingly, it is ORDERED that respondent Jeanne Robinson is suspended from the practice of law in the District of Columbia for a period of sixty days, beginning thirty days after the date of this order, with reinstatement to be conditioned on a showing of fitness pursuant to D.C. Bar R. XI, § 16. Respondent's attention is called to the provisions of the requirements of § 14 and the consequences of noncompliance set forth in said § 16.