In re Laurence A. ELGIN, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals Bar Registration (Bar Registration No. 159582).

No. 04–BG–919.

District of Columbia Court of Appeals.

Argued Oct. 13, 2005.

Decided March 8, 2007.

James P. Schaller, with whom Arthur D. Burger was on the brief, Washington, for respondent.

Julia L. Porter, Senior Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Acting Bar Counsel at the time, was on the brief, Washington, for Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before REID and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.

1. Rule 1.2(a) ("A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.").

2. Rule 1.3(b)(2) ("A lawyer shall not intentionally: ... (2) Prejudice or damage a client during the course of a professional relationship.").

3. Rule 1.4(a) ("A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.") and (b) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.").

4. Rule 1.5(b) ("When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation.").

REID, Associate Judge:

The Board on Professional Responsibility ("the Board" or "the BPR") has recommended that respondent, Laurence A. Elgin, be suspended from the practice of law for six months and be required to pay Saundra Burka, one of his clients and a close friend of Mr. Elgin's wife, restitution in the amount of $5,000.00 with interest as a condition of reinstatement. The Board adopted the findings of the Hearing Committee ("the Committee") which determined that Mr. Elgin had violated the District of Columbia Rules of Professional Responsibility because he: 1) failed to consult with his client concerning a settlement;[1] 2) intentionally prejudiced his client's interests;[2] 3) failed to keep his client reasonably informed about the terms and conditions involved in the initiation and settlement of a lawsuit;[3] 4) failed to adequately explain to his client the basis for his legal fees;[4] 5) failed to disclose a conflict of interest to his client;[5] 6) entered into an impermissible business transaction with his client;[6] 7) engaged in dis-

5. Rule 1.7(b)(4) ("[A] lawyer shall not represent a client with respect to a matter if: ... (4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.").

6. Rule 1.8(a) ("A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless: (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client in a manner which can be reasonably understood by the client; (2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) The client consents in writing thereto.").

honest conduct;[7] and 8) interfered with the administration of justice.[8] The Board agreed with the Committee that Mr. Elgin had not violated Rule 1.15(b) by making unauthorized use of Ms. Burka's credit card, and that, in fact, Ms. Burka had authorized use of the credit card.[9] However, because the Board decided that the Committee's recommendation of a one-year suspension as a sanction was overly harsh, it reduced the recommended sanction to six months, with the condition that Mr. Elgin pay restitution to Ms. Burka before he could be reinstated. The District of Columbia Bar Counsel ("Bar Counsel") and Mr. Elgin filed exceptions to the Board's report and recommendation.

Bar Counsel argues that Mr. Elgin's "dishonesty was far more pervasive and egregious than the Hearing Committee and the Board concluded," and that the sanction recommended by the Board is too lenient. Bar Counsel believes the appropriate sanction is either disbarment or a three-year suspension, full restitution,[10] and a fitness requirement as a condition of reinstatement. Mr. Elgin contends in his brief that a suspension of six months is inordinately severe, and that the court should impose public censure as his sanction, in addition to ordering restitution as a

condition of reinstatement. During oral argument, Mr. Elgin expressed the view that, in the alternative, a three-month suspension, with a restitution requirement, would be acceptable.

Given the seriousness of Mr. Elgin's misconduct and in light of sanctions imposed in pertinent past cases, we impose the Board-recommended sanction of suspension for six months, and restitution in the amount of $5,000.00 to Ms. Burka, with interest, as a condition of reinstatement.

## FACTUAL SUMMARY

As a result of Ms. Burka's complaint, on August 16, 2000, Bar Counsel filed specification of charges and began formal disciplinary proceedings against Mr. Elgin, alleging that he violated Rules 1.2, 1.3(b)(2), 1.4(a) and (b), 1.5(b), 1.7(b)(4), 1.8(a), 1.15(b), 8.4(c), and 8.4(d) of the Rules of Professional Conduct. This matter was heard by the Committee on February 2, 7 and 16; March 19 and 21; and May 5 and 12, 2001. Bar Counsel called several witnesses, including Ms. Burka and Mr. Burka. Mr. Elgin testified and called Mrs. Elgin and other witnesses. The Hearing Committee issued its report and recommendation on December 3, 2003, finding

7. Rule 8.4(c) ("It is professional misconduct for a lawyer to: ... Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.").

8. Rule 8.4(d) ("It is professional misconduct for a lawyer to: ... Engage in conduct that seriously interferes with the administration of justice....").

9. Rule 1.15(b) states:
 Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the

client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property, subject to Rule 1.6.
 In concluding that Mr. Elgin did not violate Rule 1.15(b), the Committee stated that his "use of the [Crestar credit] card [belonging to Ms. Burka], in any amount, was authorized by Ms. Burka," and that if Ms. Burka "had any concern about the use of the card, it made little sense ... that she did not cancel the card and/or have bills sent to her own address so she could keep an eye on the charges."

10. Bar Counsel considers full restitution to amount to $10,000.00 plus interest.

that Mr. Elgin had violated Rules 1.2, 1.3(b)(2), 1.4(a) and (b), 1.5(b), 1.7(b)(4), 1.8(a), 8.4(c), and 8.4(d), but not Rule 1.15(b).

### The Committee's Pertinent Factual Findings

The record compiled by the Committee shows that Mr. Elgin first met Ms. Burka in 1980 at his wedding. His wife, Eileen Elgin ("Mrs. Elgin"), and Ms. Burka met in 1973 while working together as real estate trainees and agents in Northern Virginia. They later became close personal friends. In 1982, Ms. Burka lent Mrs. Elgin $6,000.00 to assist the Elgins' with their personal expenses.[11]

The controversy over Mr. Elgin's representation of Ms. Burka has its roots in the year 1983. In early 1983, Mr. Elgin provided Ms. Burka with legal services in relation to a greeting card company that she intended to create. The Committee found that Mr. Elgin had worked 36.25 hours for Ms. Burka on this venture and was compensated in the amount of $2,500. Despite Mr. Elgin's contentions that he regularly represented Ms. Burka between 1983 and 1993, the Committee determined that from April 5, 1983 to 1993, he received no other remuneration for any legal services he provided to Ms. Burka. While the Committee concluded that Mr. Elgin had intermittently provided legal advice to Ms. Burka, it did not consider such advice to constitute "regular representation in the usual sense of the phrase."

The relationship between Ms. Burka and the Elgins became more complicated in 1993, when the Burkas' marriage collapsed and Ms. Burka required legal assistance. As part of the termination of their marriage, in early 1993, the Burkas entered into a Property Settlement Agreement ("PSA"). The PSA provided that a defaulting party would be responsible for "all reasonable fees and costs (attorney's fees, court costs, and the like) incurred by the party seeking enforcement of the Agreement." Consistent with the PSA, Ms. Burka was awarded a cash sum and alimony for five years. A few months later, in or about May 1993, Mr. Burka sued his ex-wife, alleging that during her final walk-through of their marital home, she had violated the terms of the PSA by taking property designated for him. Mr. Burka sought the return of or compensation for the property, as well as attorney's fees. In October 1993, this action was consolidated by the Fairfax, Virginia Circuit Court with the Burkas' divorce proceeding. Ms. Burka initially chose Mark Barondess to represent her, but when it became clear he might be called as a witness, she began searching for alternate, less expensive counsel.

After discussing the matter with Mrs. Elgin, Ms. Burka asked and Mr. Elgin agreed in October 1993 to represent her in the consolidated action for a flat fee of $10,000.00 plus expenses.[12] It is uncon-

11. Although Ms. Burka related the $6,000.00 loan to medical costs for the twins who were diagnosed with asthma at an early age, the Committee credited Ms. Elgin's recollection that Ms. Burka lent the money to her at her request while Mr. Elgin was in a medical malpractice trial in Little Washington, Virginia. Ms. Elgin asked to borrow $5,000.00, but Ms. Burka sent her $6,000.00 (Mr. Elgin was not a party to the loan). Ms. Burka apparently never asked that the money be repaid by a certain date.

12. While the Committee found that Mr. Elgin agreed to the $10,000.00 flat fee, it also determined that he "thought he might be able to recover attorney's fees from Ms. Burka's husband under the [Property Settlement Agreement]. . . ." Furthermore, the Committee "believe[d] that [Mr. Elgin] expected to keep track of time spent and at some point [to] calculate bills on an hourly basis in the chance of recovering [the hourly sum] from Mr. Burka."

tested that this oral fee agreement was never reduced to writing. Ms. Burka paid the $10,000.00 fee in addition to other expenses, which included charges for local counsel since Mr. Elgin was not a member of the Virginia Bar. The Committee found that there was such confusion over the cost of the representation that it could not be said that Mr. Elgin had adequately explained the terms of his fees to Ms. Burka.[13]

The confusion over the attorney's fees intensified in late 1993 when the Internal Revenue Service ("IRS") notified Ms. Burka that she owed $34,000.00 plus $4,500.00 in interest relating to a joint 1991 tax return filed by the Burkas; she paid the sum in protest. In early 1994, Mr. Elgin alleged as an affirmative defense in the consolidated action against Ms. Burka, that Mr. Burka had breached the PSA by applying to the IRS for payment of that portion of the 1991 tax refund received by Ms. Burka. Mr. Elgin also filed a separate action in May 1994, alleging the same misconduct on the part of Mr. Burka, and submitted a motion to join the separate claim to the consolidated action. In July of 1995 the Fairfax Circuit Court denied Mr. Elgin's motion, and on August 30, 1995, Mr. Elgin filed a breach of contract action in the Fairfax Circuit Court pertaining to the IRS matter. When Mr. Burka's motion to dismiss this claim failed in early December 1995, the discovery phase proceeded during which Mr. Elgin offered and Mr. Burka rejected a settlement offer. In July 1996, the Fairfax court dismissed the breach of contract action with prejudice.

In July of 1994, Mr. Burka won his consolidated action. Ms. Burka, still represented by Mr. Elgin, appealed and lost again as the Court of Appeals of Virginia affirmed the judgment in favor of Mr. Burka on May 2, 1995. Mr. Elgin, on behalf of Ms. Burka, then petitioned for leave to appeal to the Supreme Court of Virginia but on September 15, 1995, that court dismissed the petition. The Committee found that "Ms. Burka was deeply involved in many of the details of the litigation of the [various legal actions], . . . that she raised many considerations that required substantial amounts of Mrs. Elgin's time to listen and record them and required significant amounts of [Mr. Elgin's] time to review and consider what action to take."

From an examination of the evidence regarding these legal actions and from the testimony of various witnesses, the Committee discredited Ms. Burka's testimony that she only discovered that Mr. Elgin was not a Virginia lawyer on the " 'first day of court in March '94.' " Although the Committee found that the Elgins never explicitly advised Ms. Burka at the outset that Mr. Elgin was not a Virginia lawyer, it credited Mrs. Elgin's testimony that Ms. Burka knew this from previous legal dealings with Mr. Elgin and it also credited Mr. Elgin's testimony that Ms. Burka was heavily involved in the selection of local counsel. The Committee did not agree with Bar Counsel that Ms. Burka was unaware that she would have to pay additional expenses above the $10,000.00 amount for local counsel.

In addition, the Committee stated that "[d]ue to the complications that arose with regard to the IRS and the affirmative actions that were filed, it would be reasonable for [Mr. Elgin] to seek a revision to the flat fee arrangement." Although there were considerable discrepancies regarding

13. Three different co-counsels are mentioned in the Committee report: Kenneth Bergquist, Vail Pischke, and Dennis Burke.

additional fees paid to Mr. Elgin by Ms. Burka, the Committee determined that pursuant to an agreement between the Elgins and Ms. Burka, the Elgins were

to accept $4,000 as a fee payment for the affirmative IRS matter (to be paid through Ms. Burka's repayment of bills incurred by [the Elgins] on [a] Crestar credit card), with an understanding that [Mr. Elgin's] request for a $10,000 retainer (for matters beyond those reasonably expected at the time representation began in October 1993) was being discounted by a $6,000 repayment of the 1982 loan to the Elgins.

The Crestar credit card which belonged to Ms. Burka and which had a maximum limit of $10,000.00 and a zero balance, created more problems. Ms. Burka not only gave the card to Mrs. Elgin but also indicated that she would pay charges up to the specified amount. True to her word, Ms. Burka paid the first $4,000.00 the Elgins charged to the card. Ms. Burka maintained that she did not authorize the Elgins to make charges on the card in excess of $4,000.00. However, the Committee concluded that by the end of June 1994, the Elgins had charged $9,420.04 on the credit card and Ms. Burka was aware of these charges because the bill was sent to her home. Bar Counsel asserted that Mr. Elgin misused the credit card by making charges on the card in excess of $4,000.00, but the Committee stated that Bar Counsel "failed to prove by clear and convincing

evidence that the Elgins were authorized to charge only the $4,000...." The Committee again discredited Ms. Burka's testimony, noting:

If Ms. Burka felt coerced to hand over the card and intended to limit charges to $4,000 ... her subsequent behavior seems unusual. First, it seems inconsistent with the very friendly note [Ms. Burka sent with a] replacement card.[14] Further, Ms. Burka was, at least to some degree, aware of the Elgins' past financial problems. She had previously loaned them $6,000 that was never repaid. Given the degree of sophistication about business that she displayed to the Committee, the Committee found it hard to believe that she would have given her credit card for use by another except for the reasons given by the Elgins—a degree of personal concern for their situation[15] and the convenience to her of not having to come up with a lump of cash right away.

Ms. Burka's account of her actions when the Elgins had charged more than $4,000 seems odd as well. She knew they had a credit card of hers with a $10,000 limit and were having some difficulty paying the bills. She nonetheless had the statements sent to their address and did not cancel the card.[16] She says she did not cancel the card because [Mr. Elgin] told her it had been destroyed. If she believed that at the time, however, it still seems odd that someone with

14. Upon realizing the first card she sent had expired, Ms. Burka sent along a new card with the following note, postmarked April 25, 1994:

Dear Eileen,

I guess I've really lost my mind. Here is a new credit card for your use! Say hello to the kids for me and take good care of yourself and Lar. See you in July if not sooner.

Love,
Sandee

15. Prior to February 4, 1995, Matthew Elgin, one of the Elgins' twin boys, had been hospitalized seven times for medical complications resulting from his chronic asthma, two of which required treatment in intensive care.

16. Ms. Burka testified that after June 1994 she had the credit card company send the bills to the Elgins' house so that the charges "would become their responsibility."

Ms. Burka's sophistication would not have canceled the card with Crestar.

In July of 1994, Ms. Burka paid down another $5,000.00 on the Crestar credit card. The reason for this was also in dispute, with Ms. Burka characterizing it as a loan given to the Elgins in a time of need, and the Elgins characterizing it as payment for Mr. Elgin's work on the appeal of the consolidated action. The Committee

credit[ed the Elgins'] testimony insofar as Ms. Burka was aware that they considered the $5,000 payment to be applied to fees. Their testimony [wa]s consistent with the timing of the payment in connection with the loss at trial of the [consolidated] action and Ms. Burka's desire to appeal.... Further, ·the amount [wa]s consistent with a minimal fee for an appeal in what appears to have been a rather complex matter. Ms. Burka's notation on the check, 'loan to L.E.'[17] [wa]s consistent with her testimony at the hearing, but that check would not have been something seen by the Elgins.... Ms. Burka's rationale for not requesting a note for the 'loan' [wa]s inconsistent with her business acumen and her knowledge at the time.[18]

Therefore, [the Committee found] that while, with the lack of clarity about what the original $10,000 fee was to cover, there may have been some dispute about payment of the $5,000, the Elgins believed that Ms. Burka had agreed to the $5,000 extra payment for the appeal, while Ms. Burka did not see it that way.

By September 20, 1994, the Crestar credit card showed a balance of $11,200.86, including a fee for charges in excess of the card's $10,000.00 limit. Although the Elgins attempted to pay down the balance, by July 20, 1995 the outstanding balance was $10,840.51, including $840.51 in excess of the $10,000.00 credit limit. As a result, Crestar Consumer Finance Corporation ("Crestar") sued Ms. Burka in Fairfax Circuit Court seeking repayment. The Motion of Judgment was posted on the front door of the Elgins' house on July 24, 1995; Ms. Burka initially had no notice of the action against her.

The Committee found that Mr. Elgin failed to notify Ms. Burka of the Crestar action against her in a timely fashion. In fact, there is little dispute that Mr. Elgin filed an answer to the complaint on August 14, 1995 on Ms. Burka's behalf without even informing her of the suit.[19] Although

17. Ms. Burka testified that she did not take a note on the loan, but that she did write "loan to L.E." on the check itself. However, this was a check sent to Crestar, not the Elgins.

18. Ms. Burka claimed that she was willing to loan the financially strapped Elgins the money because 1) they were "desperate"; 2) she thought she was going to win the appeal; and 3) she did not think that Mr. Elgin would default on the loan, or as she puts it "steal from me."

19. The name of Mr. Dennis Burke, a local Virginia counsel, was signed by either Mr. or Mrs. Elgin at the bottom of the answer to the Crestar complaint. Mr. Burke only recalled being advised that the suit had been filed and that it was settled; he did not recall making any further inquiry about the case and he

testified that he would not have agreed to serve as local counsel if he had known the facts of the case.

Mr. Burke was diagnosed with leukemia in either 1996 or 1997. When he testified by phone during the Committee's hearings, he noted that he had just come back from chemotherapy, had "a whole skin full of drugs, and [was] not operating at peak efficiency." He commented that the chemotherapy treatment impaired his memory: "I'm having difficulty with long-term memory. Previously, I think I'd probably be fairly certain about dates, but I can't be now because I don't recall dates." When asked if it was likely that he could forget an event, like a telephone call, had occurred at all, Mr. Burke replied "[i]t is entirely possible that I may have forgotten a telephone conversation.... It concerns me a

Mr. Elgin claimed to have told Ms. Burka about the lawsuit within a day or two of receiving notice, the Committee discredited his testimony. However, the Committee chose not to credit Ms. Burka's testimony that the Elgins never informed her of the lawsuit. Instead, the Committee found that it was "at least as likely as not that Ms. Burka was told about the Crestar lawsuit," based largely on Mrs. Elgin's testimony that she heard Mr. Elgin conduct a three-way conversation with Mr. Burka and Ms. Burka sometime in October or November of 1995 regarding the lawsuit. Mr. Elgin settled the Crestar lawsuit and the Fairfax Circuit Court dismissed the case on March 11, 1996. Mr. Elgin claims that the settlement was simply a matter of telling Crestar's counsel of the repayment schedule he had agreed to with Crestar. However, the details of that schedule and the terms of the settlement were never disclosed.

The Elgins took responsibility for the credit card balance and by August 11, 1998, they had reduced it to $5,937.48. However, they consistently had difficulty raising the money to pay off the debt, and while Ms. Burka testified that she was unaware of the 1995 Crestar lawsuit, she was aware of the Elgins' struggles.[20] In the late summer of 1995, Ms. Burka ap-

plied for a mortgage on a new home and was advised that her credit report reflected a debt to Crestar. She then insisted that Mr. Elgin put in writing that he was responsible for the debt and, further, pay the outstanding balance; she received the requested letter in October 1995. Ms. Burka also said that she was contacted by Crestar in mid–1996 because of a number of bad checks that the Elgins had been sending in.

Since the Elgins did not extinguish the outstanding balance, Crestar threatened to file suit against Ms. Burka again in August, 1998; however, this time Crestar contacted Ms. Burka directly. Ms. Burka again told the Elgins to pay down the outstanding balance but she claims that the Elgins informed her that they had no money to pay the bill and that they would pay her back when they had the money. As a result Ms. Burka arranged a settlement with Crestar whereby she paid a lump sum of $5,000 and Crestar agreed to drop the suit.

Ms. Burka then sued the Elgins on October 7, 1998 alleging that Mr. Elgin had "improperly used her Crestar credit car and abused his fiduciary duty as her attorney. She sought damages in the amount of $10,000." Mr. Elgin answered the com-

great deal." Consequently, while the Committee took account of Mr. Burke's thoughts on ethical matters, it concluded that his testimony was "unreliable given the medication he was taking and its effects on him." Therefore, his testimony that he did not remember having a three-way telephone conversation with Mr. Elgin and Ms. Burka, see infra p. 12, concerning the lawsuit was not credited.

20. The ill health of Matthew Elgin was a major factor in the Elgins' lives. His most severe asthmatic attack came on February 4, 1995, when he was taken to the emergency room, unable to breathe on his own. He remained in intensive care for forty-four days. Ultimately he was transferred from Fairfax Hospital to the Children's Medical and Surgi-

cal Center at Johns Hopkins and then transferred again on May 10, 1995 to the Kluge Children's Rehabilitation Center at the University of Virginia via an ambulance and private plane, accompanied by a nurse and EMT crew. He returned home but received physical therapy twice a week from May 23–July 20, 1995. On October 18, 1995 his doctor estimated that he would fully recover 12–15 months from the onset of the illness. During some of the periods of Matthew's illness, the Elgins did not have medical insurance though they did receive Virginia Medicaid for Matthew's 1995 hospitalization, which cost "a couple hundred thousand dollars," according to Mrs. Elgin's estimations.

plaint on November 6, 1998, claiming that he was not indebted to Ms. Burka because she owed him and his co-counsel, Vail Pischke, $92,396.38 for legal fees as a result of the work he had done for Ms. Burka regarding the PSA and IRS issues. After discussing the case with her lawyer, Ms. Burka ultimately decided to drop the suit due to the low probability that the Elgins would ever be able to pay the damages.

### The Committee's Credibility Determinations and Conclusions

The Committee's findings rested largely upon credibility determinations, especially regarding the testimony of Ms. Burka and the Elgins. The Committee considered Ms. Burka an "intelligent woman, relatively sophisticated in business and legal affairs." However, it questioned Ms. Burka's testimony at the hearing on the charges against Mr. Elgin. Overall, it found her testimony to be "inconsistent with documents and logical inferences from other evidence" and therefore not credible. As the Committee put it: "[Ms. Burka] seemed almost always to take the most extreme view of the facts, e.g. to be sure something 'never' happened if that supported her claim versus Respondent's." The Committee went on to provide several examples of situations where it considered Ms. Burka's testimony to be inconsistent with documentary evidence and not credible in other respects.[21]

Mr. Elgin's testimony was somewhat "erratic" and the Committee did not credit it entirely. However, unlike Ms. Burka, he did not provide testimony favorable only to his case, and the Committee viewed his demeanor more consistent with that of an honest person.

The Committee determined "Ms. Elgin to be the most straightforward and to the point and to offer what seemed to be the most accurate account of past events." "In her demeanor and in the substance of her testimony," Ms. Elgin appeared to be "genuinely seeking to remember what happened." Moreover, her testimony "did not always seem simply calculated to put her husband in the best light."

After concluding that Mr. Elgin violated all but one of the rules on which Bar Counsel's charges were based, the Committee recommended that Mr. Elgin be suspended for one year. Bar Counsel and Mr. Elgin filed exceptions and oral argument was heard before the Board on May 6, 2004. The Board adopted the Committee's findings of fact, assessments of credibility, and determinations of Rule violations; however, in its report of July 30, 2004, the Board recommended a six-month suspension, rather than a one-year suspension, based on its analysis of several cases of our past cases.

### ANALYSIS

Bar Counsel's central argument, supported by reference to particular actions by Mr. Elgin and findings it believes the Committee should have made, is that the record shows a pattern of dishonesty so

---

21. For example, Ms. Burka's testimony that she had little involvement in the details of her litigation with her former husband conflicted with numerous exhibits reflecting her involvement in the minutia of preparation of discovery responses, deposition questioning etc. The Committee also examined Ms. Burka's testimony in her divorce action and found it suspicious (and reminiscent of her testimony before the Committee) that she was unable to recall whether she lent her sister up to $150,000 during the course of her marriage. Finally, "the Committee found Ms. Burka consistently attempting to minimize [her] relationship [with the Elgins] while physical evidence and the logic of events, such as Mrs. Elgin's role in Ms. Burka's wedding, Ms. Burka's attention to the birth of the Elgin's first child, and the 1982 loan suggested otherwise."

pervasive that it warrants Mr. Elgin's disbarment, or at the minimum, three years suspension plus fitness and restitution in the amount of $10,000.00. From Bar Counsel's perspective, Mr. Elgin's "misconduct was not isolated, but occurred over several years beginning in October 1993 . . . and continuing through the time [Ms. Burka] filed a civil action and subsequent ethical complaint against him in 1999." Bar Counsel faults Mr. Elgin for not having reimbursed Ms. Burka and for not "show[ing][any] remorse for his misconduct." Bar Counsel also contends that Mr. Elgin's "secret settlement provided no benefit to his client, but severely prejudiced her interests by leaving her exposed for his debt and further breaches."

The Board did not submit a brief but presented oral argument at the request of the court. The Board takes issue with the sanction advocated by Bar Counsel, asserting that its advocacy of disbarment or a three-year suspension is based on a case it failed to prove in its entirety. In particular, the Board emphasizes the Committee's finding that Ms. Burka had in fact authorized the use of her credit card above the $4,000.00 amount. Furthermore, while the Board viewed Mr. Elgin's misconduct as quite serious, it was not severe enough to merit disbarment or a three-year suspension, given this court's past cases.

Mr. Elgin requests leniency concerning his sanction. Specifically, he advocates public censure or, at a maximum, a three-month suspension. He claims that his lengthy, previously unblemished record; the unusual nature of his relationship with Ms. Burka because of his wife's friendship with her; and the strain on his emotions and finances caused by his son's illness are all mitigating factors. And he notes that both the Board and the Committee found that there was little likelihood that he would repeat his misconduct in the future;

consequently, a severe sanction would be unnecessary to protect the courts, the Bar and the public.

### Standard of Review

■■■ When examining a Report and Recommendation from the Board on Professional Responsibility, "the scope of our review . . . is limited." *In re Bailey*, 883 A.2d 106, 115 (D.C.2005) (internal quotation marks and other citation omitted) (quoting *In re Berryman*, 764 A.2d 760, 766 (D.C.2000)). We must "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." D.C. Bar R. XI, § 9(g) (2006); *see Bailey, supra*, 883 A.2d at 115; *In re Thyden*, 877 A.2d 129, 137 (D.C.2005). In a similar fashion, "the Board is obliged to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole." *Berryman, supra*, 764 A.2d at 766 (citing *In re Micheel*, 610 A.2d 231, 234 (D.C.1992)). Moreover, "the Board 'must defer to . . . [the] credibility determinations[ ] made by the [Board's] fact-finding body (the hearing committee) . . . .'" *Id.* (quoting *Micheel, supra*, 610 A.2d at 234).

We have no doubt that there is substantial evidence in the record to support the Committee's findings, which have been adopted by the Board. Moreover, given the Committee's credibility determinations, which the Board did not disturb, we are satisfied that some of the allegations of dishonesty lodged by Bar Counsel were not established by clear and convincing evidence, as the Committee and the Board concluded. Bar Counsel and the Board are divided by whether these additional

allegations of dishonesty should have been sustained by the Committee. And, the Board, Bar Counsel and Mr. Elgin disagree about the seriousness of Mr. Elgin's conduct. Hence, as a prelude to consideration of the sanction we impose on Mr. Elgin, we examine the seriousness and the implications of his misconduct.

### The Seriousness of the Violations

Mr. Elgin's conduct was undeniably serious. The thorough and detailed work of the Committee in this case depicts a member of our bar who looked upon his wife's close friend, who later became his client, as a resource for coping with difficult financial situations.

Mr. Elgin's early contact with Ms. Burka was not problematic. When his wife sought a loan from the then apparently financially secure Ms. Burka in 1982 to help meet the Elgins' family expenses while Mr. Elgin handled a medical malpractice case, Ms. Burka had not yet become his client. Mr. Elgin's initial legal assistance to Ms. Burka, in 1983, was relatively simple and concerned her desire to create a greeting card business. In 1993 and beyond, however, Mr. Elgin's representation of Ms. Burka was much more complex and extensive, and he permitted his personal life and finances to become entangled with Ms. Burka's interests, and he ignored certain of his ethical responsibilities.

■ After Ms. Burka's marriage failed, she requested legal representation by Mr. Elgin, including her defense against Mr. Burka's lawsuit for breach of the couple's property settlement agreement, defense of a lawsuit against her filed by the IRS, representation of her during divorce proceedings, an offensive lawsuit against Mr.

Burka for breach of contract, and appeals relating to some of these actions. Yet, Mr. Burka did not enter into a formal, written fee agreement with Ms. Burka, and his oral agreement for a $10,000.00 fee eventually spawned questions as to whether that flat fee also covered more than the property settlement lawsuit representation. In short, Mr. Elgin violated Rule 1.5(b) by failing to adequately explain the basis of his legal fees to Ms. Burka.[22]

Significantly, efforts to sort out how much above the $10,000.00 flat fee, if anything, Mr. Elgin should receive for his services sent him deeper into the mire of unethical entanglement with Ms. Burka. As a way to pay for some additional legal services, Ms. Burka permitted the Elgins to use her Crestar credit card with the understanding that she would pay off their charges; ultimately, Ms. Burka made a $4,000.00 and a $5,000.00 payment for the Elgins' charges against her Crestar credit card.

■ Obviously Mr. Elgin felt pressured not only by the severe, chronic physical condition of one of his twin sons whose ability to breathe at times was threatened by harsh asthma attacks requiring emergency hospitalization and even long-term intensive care treatment on at least one occasion, but also by mounting medical bills in the face of his apparently limited resources. Ms. Burka's credit card served as a convenient way for the Elgins to pay for basic necessities as well as pharmaceutical and other medical expenses, and office supplies for Mr. Elgin's law practice. Because of the Elgins' personal charges on her credit card, Ms. Burka arranged for her Crestar credit card bills to be sent directly to the Elgins for payment. Mr. Elgin continued to participate in the use of

---

22. We agree with the Committee's finding that when Mr. Elgin agreed to represent Ms. Burka in 1993, she was not his regular client and hence could not successfully argue that he "regularly represented the client," within the meaning of Rule 1.5(b).

Ms. Burka's credit card for personal expenses, ignoring the admonition of Rule 1.7(b)(4) that he should not represent a client where his "professional judgment on behalf of the client will be or reasonably may be adversely affected by ... the lawyer's own financial, business, ... or personal interests," and he failed to advise Ms. Burka that his financial and personal interests conflicted with her interests.

 When Ms. Burka decided to move to Virginia Beach, Virginia around 1995 and explored mortgage options for the purchase of a home there, she was stunned to learn that her credit rating had eroded badly because the Elgins were not making timely and complete payments for their personal credit card charges. The pressure on Mr. Elgin increased and instead of acting responsibly and in a trustworthy manner, he descended into dishonesty and deceit, in violation of Rule 8.4(c) and committed other ethical violations. After Crestar sued Ms. Burka in July 1995, Mr. Elgin initially concealed the lawsuit from her and sought to defend it, even filing an Answer on her behalf without notifying her, in violation of Rule 1.3(b)(2). In addition, he did not obtain the signature of local Virginia counsel (required because he was not a member of the Virginia Bar), but either he or his wife signed the name of a Virginia counsel, Dennis Burke.

 To make matters worse, Mr. Elgin settled the Crestar action in 1996, on terms which he negotiated and apparently did not disclose to Ms. Burka, in violation of the canon requiring a lawyer to "abide by a client's decision whether to accept an offer of settlement" (Rule 1.2(a)); the rule admonishing a lawyer not to "intentionally ... [p]rejudice or damage a client during the course of a professional relationship" (Rule 1.3(b)(2)); the canon requiring a lawyer to keep his client reasonably informed about a matter and to provide sufficient information on which a client could make an informed decision (Rule 1.4(a)); the rule prohibiting an attorney from acquiring a "pecuniary interest adverse to his client," and in such circumstances, requiring that the attorney be "given a reasonable opportunity to seek the advice of independent counsel in the transaction" (Rule 1.8(a)). He also violated Rule 8.4(d) not only by filing an Answer and settling the Crestar lawsuit without proper disclosure to Ms. Burka, but also by not seeking pro hac vice status in Virginia, the site of the Crestar lawsuit, where he is not a member of the bar. In addition, Mr. Elgin may have violated Virginia Rule 5–104(a) because of his failure to disclose to Ms. Burka, either in writing or orally, that she had potential liability pertaining to the Crestar lawsuit.

Even after his settlement of the Crestar lawsuit, Mr. Elgin's conduct was not honorable or straightforward under Rule 8.4(c). He failed to abide by the settlement terms, and when Crestar threatened Ms. Burka with another lawsuit in August 1998, she paid $5,000.00 to settle the action. After she sued the Elgins in an effort to recoup her $5,000.00, Mr. Elgin filed a counterclaim for $92,396.38 in alleged outstanding legal fees for himself and a Virginia co-counsel. Eventually, after consultation with other counsel, Ms. Burka dropped the lawsuit given the Elgins' financial status.

Simply put, there is substantial evidence of Mr. Elgin's serious violations of our professional conduct rules, even without the additional acts of dishonesty (impacted by the Committee's credibility determinations) which Bar Counsel believes to be supported by clear and convincing record evidence. Given our standard of review, however, we must defer to the factual findings and the credibility determinations of the Board which is bound by the Commit-

tee's findings and credibility determinations. *Bailey, supra,* 883 A.2d at 115; *Berryman, supra,* 764 A.2d at 766.

**The Sanction**

"So long as the Board's sanction recommendation falls within the wide range of acceptable outcomes, it comes to us with a strong presumption in favor of its imposition...." *In re Bingham,* 881 A.2d 619, 623 (D.C.2005). But, we base sanctions on a number of factors, including, but not limited to:

> (1) the seriousness of the conduct at issue; (2) the prejudice, if any, to the client which resulted from the conduct; (3) whether the conduct involved dishonesty and/or misrepresentation; (4) the presence or absence of violations of other provisions of the disciplinary rules[;] (5) whether the attorney had a previous disciplinary history; (6) whether or not the attorney acknowledged his or her wrongful conduct; and (7) circumstances in mitigation of the misconduct.

*In re Thyden,* 877 A.2d 129, 144 (D.C. 2005) (citing *In re Jackson,* 650 A.2d 675, 678–79 (D.C.1994) (per curiam)); and *In re Hill,* 619 A.2d 936, 939 (D.C.1993) (per curiam). Similarly, we have said that "[i]n deciding whether to adopt the Board's recommendation, we must examine the 'nature of the violation, aggravating and mitigating circumstances, the absence or presence of our prior disciplinary sanctions, the moral fitness of the attorney, and the need to protect the legal profession, the courts, and the public.'" *Bingham, supra,* 881 A.2d at 623 (quoting *In re McLain,* 671 A.2d 951, 954 (D.C.1996)); *In re Robinson,* 736 A.2d 983, 988 (D.C. 1999). We also consider the number of clients prejudiced by an attorney's misconduct, *see In re Ryan,* 670 A.2d 375, 381 (D.C.1996); the degree of vulnerability of the client prejudiced and the experience level of the attorney, *see Austin, supra,* 858 A.2d at 976; *In re Jones–Terrell,* 712 A.2d 496 (D.C.1998); and the time span of the misconduct, *see In re Shay,* 749 A.2d 142 (D.C.2000), republished at 756 A.2d 465 (D.C.2000), together with the Report and Recommendation of the BPR; *Ryan, supra,* 670 A.2d at 381. We do not base sanctions solely on the consequences of an attorney's misconduct. *See Hager, supra,* 812 A.2d at 913–14. And, "[o]ur purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney; rather, it is to offer the desired protection by assuring the continued or restored fitness of an attorney to practice law." *In re Bettis,* 855 A.2d 282, 287 (D.C.2004) (quoting *In re Steele,* 630 A.2d 196, 200 (D.C.1993)). In the final analysis, it is the court which decides the sanction to be imposed. *See In re Temple,* 629 A.2d 1203, 1207 (D.C.1993).

Given the factors we consider in imposing sanctions, and in light of the Committee's factual findings, and Mr. Elgin's multiple violations of our ethical rules, his request for public censure as a sanction is far off the mark, as the Board, Committee and Bar Counsel perceived. Even his alternative advocacy of a three-month maximum sanction does not fit the seriousness of his violations of our ethical rules. On the other hand, Bar Counsel's call for disbarment on the facts of this case, particularly where there was no misappropriation charge and finding and no determination that he was motivated by greed, appears to fall outside of the warranted sanction and to be punitive. Bar Counsel's alternative recommendation of a three-year suspension also appears to be too strong a sanction given the factual findings and credibility determinations of the Committee, which the Board accepts. As we view this case and our case law, the Board's recommended sanction of suspension for six months is a closer fit with

respect to the severity of Mr. Elgin's ethical violations.

Bar Counsel seems to portray Mr. Elgin as an underhanded swindler who lured Ms. Burka to hire him as her counsel by offering to accept a flat rate of $10,000.00 as his total fee, only to later charge her an additional $15,000.00 in fees.[23] However, there is much in the record to support the Committee's finding that it was reasonable for Mr. Elgin to charge Ms. Burka more money considering the work that was involved in her legal struggles. Mr. Elgin could not have predicted that he would be representing Ms. Burka over the IRS matter when he first agreed to the $10,000.00 charge, and it is entirely possible that he did not consider the agreement to cover appeals. Thus, it appears quite reasonable that he would charge Ms. Burka more for the added work, but this does not excuse either the haphazard, informal manner in which he charged Ms. Burka, or his demand for over $90,000.00 after Ms. Burka sued him. And there is no excuse for his blatantly unethical conduct following the lawsuit filed by Crestar against Ms. Burka.

The Board focused mainly on the following cases in determining the sanction to be recommended to this court: *In re Reback*, 513 A.2d 226 (D.C.1986) (en banc) (*Reback II*) (six-month suspension); *In re Hager*, 812 A.2d 904 (D.C.2002) (one-year suspension), *Shay*, *supra*, 749 A.2d at 142 (three-month suspension), and *In re Austin*, 858 A.2d 969 (D.C.2004) (disbarment). Although the Committee believed that the present case "arose out of a business transaction that benefitted Respondent, as was the case in *Hager* and *Austin*, rather than representation of another client as was the case in *Shay*," and therefore recommended a one-year suspension ("a sanc-

tion at the higher end of the range"); the Board concluded that the misconduct in *Hager* and *Austin* was more serious than in the present case, and determined that a six-month suspension plus restitution would be sufficient to serve the interests of the public and the bar, just as it was in *In re Reback*, *supra*, (involving attorneys hired to pursue a divorce claim who forged their client's name while filing a second complaint after the first was dismissed without informing the client of the dismissal and subsequent refiling), which the Board considered to be the "same general type of dishonesty." The Board believed that six months was still a "substantial suspension [that] should send a strong signal that dishonesty will not be tolerated and that there are serious risks associated with undue informality in dealing with clients and failure to comply scrupulously with the rules on conflicts of interest and prohibited business transactions." As the Board commented, "Bar Counsel's recommendation ... that [Mr. Elgin's] misconduct warrants disbarment, or at the minimum a three-year suspension plus fitness and restitution ... fails to take full account of the facts as found by the Hearing Committee, which fully supports its conclusion that Respondent did not act out of greed or avarice."

We are not persuaded by either Bar Counsel or Mr. Elgin's arguments concerning sanctions. Bar Counsel's comparison of this case to *Gil* is unpersuasive. In *Gil*, *supra*, 656 A.2d at 303, a case in which we imposed the sanction of disbarment, we wrote, "[a] Hearing Committee and the Board both concluded that respondent engaged in conduct which amounted to theft, as well as other dishonest acts, and thereby violated Rule 8.4(b) ... (committing a

---

**23.** $10,000.00 for the added work which resulted from the IRS matter, and $5,000.00 for appealing the specific performance action.

criminal act that reflects adversely on the honesty, trustworthiness or fitness of a lawyer)...." The respondent in *Gil* did not even "dispute that his conduct would constitute larceny under District law...." *Id.* at 305. Although the facts of *Gil* are somewhat similar to the present case in that the Respondent and his client had known each other for fifteen years, what distinguishes *Gil* is that the Hearing Committee in that case found, and we agreed, that the respondent "had used over $60,000 of funds entrusted to him by [his client] for his own purposes without her knowledge or consent." *Id.* at 306 (internal quotation marks omitted). The present matter is different for two important reasons: 1) Bar Counsel never charged Mr. Elgin with violating Rule 8.4(b); and 2) the Committee found and the Board agreed that Ms. Burka had consented to the Elgins' use of the card above the $4,000.00 mark.

Bar Counsel also compares the present case to *Austin*, *supra*, a case in which we disbarred an attorney for defrauding a poor, uneducated, unsophisticated, elderly woman. In that case, the Respondent engineered a reverse mortgage on behalf of his 73-year-old client who never hired him for that purpose and then, over the course of a year and a half, borrowed nearly $27,000.00 from her on inequitable terms and failed to pay her back. 858 at 976. In *Austin*, like *Gil*, our focus was on "acts that amounted to theft and fraud." *Id.* In fact, we cited principally to *Gil* when we noted that "disbarment is appropriate in cases of fraudulent taking of funds." *Id.*

at 977–78. We do not consider *Austin* persuasive for the present case because Ms. Burka was not an elderly vulnerable client, and she authorized the Elgins' use of her credit card.

Bar Counsel provides no other examples of cases wherein an attorney was disbarred for committing violations of the kind engaged in by Mr. Elgin. Bar Counsel would have had a stronger case in support of disbarment had it been able to charge and prove that Mr. Elgin intentionally or even recklessly misappropriated funds in violation of Rule 1.15(b). *See In re Carlson*, 802 A.2d 341, 348 (D.C.2002) ("Because of the seriousness of a misappropriation offense, we have adhered to a standard of presumptive disbarment since 1990, except in cases of negligent misappropriations, or extraordinary circumstances."); *In re Addams*, 579 A.2d 190, 191 (D.C.1990) (*en banc*) ("in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence."). However, since this case does not involve criminal activity or intentional or reckless misappropriation, we agree with the Board that disbarment would be too onerous a sanction.[24]

Yet, we do not agree with Mr. Elgin that his suspension should be reduced or replaced with a public censure. Rather, we agree with the Board's conclusion that the present case "involves much more serious misconduct" than found in *In re Bland*,

---

**24.** In *In re Goffe*, 641 A.2d 458, (D.C.1994), we wrote that "prior precedent does not limit possible sanctions in attorney dishonesty cases to a suspension and that the misconduct here is of a magnitude compelling disbarment." However, the facts of *Goffe* made it unusual in that the Respondent/attorney engaged in outrageously deceitful behavior including "the repeated resort not only to false

testimony but to actual manufacture and use of false documentary evidence in official matters." *Id.* at 464. Moreover, we distinguish *Goffe* from the present case because there is little in the record to show that Mr. Elgin's behavior mirrored that of Mr. Goffe who "seemed determined to use every deception he could to accomplish a premeditated, illicit end...." *Id.* at 465.

714 A.2d 787 n. 2 (D.C.1998) [ ("The Board took particular note that the violations did not include ... 8.4(c) (dishonesty or misrepresentation).");] or *In re Hadzi–Antich,* 497 A.2d 1062, 1063 (D.C.1985) (mandating public censure for falsehoods on a resume).

Moreover, we do not agree with Mr. Elgin that his behavior was less serious than that of the respondent in *Rosen, supra,* 481 A.2d at 452–55. In that case, the attorney was found guilty of making three knowing misrepresentations to the United States District Court for the District of Columbia and was suspended for thirty days due to the aggravating factor that he had previously been sanctioned for unethical behavior. Although the attorney's conduct was intentional, his misrepresentations were not critical to the case he was pursuing. Essentially, the attorney lied to the court in order to gain more time to prepare for the trial because of his procrastination. We compared Mr. Rosen's conduct to that of another respondent who was publicly censured because he "misrepresented to the court his reason for failing to publicly appear in court on time...." *Rosen, supra,* 481 A.2d at 455. Mr. Elgin's attempt to associate his behavior with that of Mr. Rosen must fail because his dishonesty rose to a much higher level. Both the Committee and the Board agreed that Mr. Elgin had been "dishonest in respect to the Crestar suit," violating Rule 8.4(c). Mr. Elgin failed to advise Ms. Burka of the conflict of interest inherent in his representing her in the Crestar lawsuit, and indeed barely advised her of the lawsuit at all, and then he agreed to a settlement without involving her. All of this resulted in the tarnishing of Ms. Burka's credit rating, another lawsuit by Crestar against Ms. Burka which she paid $5,000.00 to settle despite the fact that the charges on her card were those of the Elgins. Thus, *Rosen* is hardly precedent

for the sanction to be imposed on Mr. Elgin.

Thus far we have determined that disbarment is too severe a penalty and public censure or thirty days suspension is too lenient. Mr. Elgin suggests, along with the Board, that *Shay, supra,* is a comparable case because it involved "conflicts of interest and dishonesty motivated not by self-interest but by the desire to help a friend." *Shay* involved an attorney who represented a friend ("J.C.") in various legal and financial matters. The attorney was privy to the fact that J.C. had not completed his divorce from his first wife when he married another woman ("E.Y."). J.C. then asked the attorney not only to draw up wills both for himself and E.Y., but also to keep secret the status of his first marriage until he could finalize the divorce. Giving great weight to her duty to keep this information in confidence and believing that she could still serve E.Y.'s interests, the attorney did not disclose to E.Y. that J.C. was still married to another woman. We ordered that the attorney be suspended for three months because we agreed with the Board's finding that "the conflict of interest was serious; it put a client at risk for a period of six years and caused her understandable emotional harm; it deprived a client of vigorous independent legal representation; and it was accompanied by dishonesty." *Shay, supra,* 756 A.2d at 483.

We see one major fault with Mr. Elgin's contention that *Shay* is a comparable case: Mr. Elgin clearly was acting out of his own financial self-interest in mishandling the Crestar suit, whereas the respondent in *Shay* was not. While we agree with the Board that Mr. Elgin "was not motivated by greed," we have doubts about the Board's conclusion that he "engaged in no deliberate self-dealing...." The Committee decided that the "conflict at issue here

arose out of a business transaction that benefitted [Mr. Elgin], ... rather than representation of another client as was the case in *Shay*." Any competent lawyer, free of a conflict of interest, would have advised Ms. Burka to bring the Elgins in as third-party defendants in the Crestar lawsuit or to in some way legally establish that she was relieved of financial liability. Despite the Committee's comment that "Respondent's dishonesty ... does not appear to have been motivated by self-dealing ...," Mr. Elgin cannot pretend that he was serving the best interests of Ms. Burka; Mr. Elgin could only have been motivated to act so unprofessionally by a desire for his own self-preservation, and that of his family at Ms. Burka's expense. "[A]n element of self-dealing," *Id.* at 485, casts a shadow on the entire legal profession when combined with dishonesty and failure to disclose a conflict of interest. We therefore conclude that a three-month suspension (imposed in *Shay* ) would be too lenient. *See In re Evans*, 902 A.2d 56, 58 (D.C.2006) (citing cases imposing sanctions ranging from ninety-day suspension to one-year suspension for conflict of interest violations).

The Board seemed to recognize that, despite the purported similarities to *Shay*, the present case involved more serious rule violations. The Board decided that six months was an adequate suspension and supported its conclusion by referring to *Reback II*, wherein the "misconduct [ ] was somewhat analogous" in that it "involved the same general type of dishonesty as found here...." *Reback II* involved two attorneys who neglected to follow-up on a client's divorce claim, which led to the dismissal of the claim by the Superior Court. The attorneys attempted to cover up their mistake by preparing a second complaint and, without telling their client, forging her signature in order to file it. A three-member panel initially ordered the respondents suspended for one year and a day, *see In re Reback*, 487 A.2d 235, 243 (D.C.1985), (*Reback I* ), *vacated*, 492 A.2d 267 (D.C.1985). However, after *en banc* review, we reduced the sanction to six months, *Reback II, supra*, 513 A.2d at 233, primarily because of the following factors of mitigation: "respondents ha[d] admitted their wrongdoing, [we]re contrite, and ha[d] cooperated fully throughout the[ ] proceedings." *Id.* Moreover, after the attorneys had been dismissed by their client upon her discovery of their misconduct, "they promptly returned the fee she had paid." [25] *Id.*

It is true that neither the Committee nor the Board found that Bar Counsel had proved by clear and convincing evidence that Mr. Elgin concealed the existence of the Crestar lawsuit, as the attorneys in *Reback* did. It is also the case that forgery is not a major issue in the present case.[26] However, *Reback* did not involve a

---

**25.** It is true that we also wrote: "Most important is the fact that both [attorneys] have had unblemished records of professional conduct during 30 and 15 years of practice respectively. This factor weighs heavily in favor of imposing upon them the lightest sanction...." *Reback II, supra*, 513 A.2d at 233. However, we wrote that in the context of the other mitigating factors, as well as our acknowledgment that "their dishonesty, as such, caused the client little, if any, prejudice." *Id.* at 232.

**26.** The fact that the attorneys in *Reback* had forged their client's signature was a major factor in the case. *Reback II, supra*, 513 A.2d at 232. In the present case, there was some concern that the Elgins had forged the signature of Mr. Burke on the answer Mr. Elgin filed in response to the Crestar lawsuit. However, neither the Committee nor the Board made a finding of fact concerning this issue. Mr. Elgin explained at oral argument that it is customary for lawyers to sign for local counsel with the latter's consent. Since the Committee found Mr. Burke's testimony

conflict of interest whereby the attorneys' personal and financial interests had become intertwined with those of their client. Rather, the attorneys in *Reback* were merely attempting to reinstate a complaint that their client had asked them to pursue in the first place. *See Hutchinson, supra,* 534 A.2d at 926 ("Reback and Parsons' objective was to revive their client's case and restore it to the court's docket, which was not inherently improper and which would indeed have somewhat rectified their prior negligence.") Their attempts to do so were clearly highly unethical, but not as serious as Mr. Elgin's misconduct. Mr. Elgin purported to represent a client without her approval, inadequately apprised her of the case, and then settled the case to her disadvantage without consulting her. In addition, unlike the sincerity of the respondents in *Reback,* Mr. Elgin's purported contrition leaves much to be desired;[27] and he still has not repaid Ms. Burka the $5,000.00 it cost her to settle the second Crestar lawsuit.[28] Nevertheless, there are cases involving conflict of interest and dishonesty violations in which we imposed a six-month suspension. *See Evans, supra,* (ordering a six-month suspension primarily for violating Rules 1.7(b)(4) (conflict of interest) and 8.4(d) (conduct that seriously interferes with the administration of justice), but not 8.4(c) (dishonesty)); *In re Starnes,* 829 A.2d 488, 489–90 (D.C.2003) (ordering a six-month suspension primarily for violation of Rule 8.1(a)) (misleading the Admissions Committee about pre-admission unauthorized practice of law in the District of Columbia) as well as a series of other Rules including 1.1(a) and (b), 1.3(a), (b), and (c) (neglect), 1.4(a) (failure to communicate), and 1.16(a) (failure to withdraw)); and *In re Lopes,* 770 A.2d 561, 565 (D.C.2001) (ordering a six-month suspension primarily for violation of Rules 8.4(c) and 8.4(d) and 1.3(a) and (c), but not 1.7(b)(4)).

The Committee, the Board, Bar Counsel and Mr. Elgin all examined *Hager, supra,* (one-year suspension) as a possible precedent for Mr. Elgin's sanction. The Committee regarded Mr. Elgin's case as comparable to *Hager* but the Board described Mr. Elgin's conduct as "far less dangerous than that in *Hager.* ..." Mr. Elgin agrees with the Board, contending "that the conduct in *Hager* was orders of magnitude graver than that of Mr. Elgin here, as was any accompanying 'ethical' numbness." Bar Counsel asserts that Mr. Elgin's "misconduct is far worse than that in [ ] *Hager,*" in part, because he entered into "a secret settlement [which] provided no benefits to his client whereas the settlement in *Hager* 'provided the clients significant relief and benefits.' " *Hager* involved a lawyer (Mr. Hager) who agreed to represent clients in a potential class action suit against a manufacturer of head-lice shampoo. Without his clients' permission, Mr. Hager entered into a settlement agreement with the manufacturer whereby the latter would pay Hager $225,000 in ex-

that he knew nothing about the Crestar lawsuit unreliable, it is impossible to know whether he consented. Moreover, because he testified that had he known the facts of the case, we must assume that he did agree to act as local counsel at some point.

27. We agree with the findings by the Committee, adopted by the Board, that Mr. Elgin was not being dishonest when he averred, in defense of Ms. Burka's claims against him, that he could not be indebted to her because he

believed she owed him in excess of $90,000.00. However, in light of this fact, his contention that he always took responsibility for the debt rings hollow.

28. As we have written, *"Reback ... was never intended to place a ceiling on the suspension to be imposed on an attorney who has engaged in dishonest conduct." Hutchinson, supra,* 534 A.2d at 925.

change for Mr. Hager's promise to a) keep the pay-off secret from his clients; and b) eschew the representation of any other client pursuing similar claims against the manufacturer.[29] Mr. Hager was found guilty of violating many of the same provisions as Mr. Elgin violated, including 1.7(b)(4) (conflict of interest) and 8.4(c) (dishonesty), but also was found guilty of violating Rule 1.8(e):

> A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1) the client consents after consultation;
>
> (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
>
> (3) information relating to representation of a client is protected as required by Rule 1.6.

The Committee found especially persuasive our comment in *Hager, supra,* 812 A.2d at 921, that Mr. Hager's misconduct "demonstrated at best an ethical numbness to the integrity of the attorney-client relationship . . . this 'occurred because respondent accorded a higher priority to the collection of his fee than to serving his client or complying with professional standards' " *Id.* (quoting *In re James,* 452 A.2d 163, 170 (D.C.1982)). We concluded that "[Respondent's] misconduct strikes at the heart of the attorney-client relationship . . . [it] encompasses precisely the fear clients have that their attorneys will be 'bought off' by opposing counsel, or that their attorneys will use the clients' case to surreptitiously profit from the representation." *Id.* While Mr. Hager was motivated by greed, the driving force behind Mr. Elgin's misconduct was somewhat comparable—self-pres-

ervation and the preservation of his family; his client's best interests clearly were ignored as he attempted to extricate himself and his family from personal and financial difficulties by using a financial resource belonging to his client. But, Mr. Elgin had only one client, Ms. Burka. Mr. Hager had multiple clients in a class action suit, each of whom looked to him to protect his or her legal interests, and each of whom was impacted by his behavior. Under these circumstances, it was not unreasonable for the Board to conclude that Mr. Elgin's misconduct was "far less dangerous" than that of Mr. Hager.

Finally, we turn to Mr. Elgin's request for leniency based on his previously unblemished disciplinary record, as well as the strain he was under due to his son's illness. In the past, we have taken into account aggravating and mitigating factors such as, but not limited to: the number of times an attorney has been sanctioned, *see Hutchinson, supra,* 534 A.2d at 924 (citing *In re Roundtree,* 467 A.2d 143, 147–48 (D.C.1983); and *Reback II, supra,* 513 A.2d at 233); and any work the attorney has done on behalf of the community, *see Hager, supra,* 812 A.2d at 922.

The fact that this is Mr. Elgin's first time being disciplined for violating the Rules of Professional Responsibility does work in his favor. However, a six-month or a one-year suspension "on [an] attorney[ ] with [a] previously unblemished record gives the Bar and the public notice that we consider the attorney's misconduct serious." *Reback II, supra,* 513 A.2d at 233. It is not unprecedented to order a suspension of considerable length on first-time offenders. *See Hager, supra,* 812 A.2d at 922 (ordering a one-year suspension

---

**29.** The manufacturer also agreed to refund the purchase price of the shampoo to Hager's clients.

despite attorney's previously spotless disciplinary record, his "extensive record of *pro bono* service," and the fact that "three witnesses testified ... as to [his] good character in general."); *Hutchinson, supra,* 534 A.2d at 925 (ordering a one-year suspension despite absence of prior disciplinary record). Despite Mr. Elgin's lengthy, untarnished career, we are troubled by his apparent abandonment of several of the major tenets of professional conduct—honesty, openness about conflicts of interest, and cooperation with the administration of justice—and his informality in dealing with a client solely because she was a friend. As the Committee wrote, "this case is appropriately seen through the lens of the dangers arising in representation of family and friends when there is a temptation to be less formal than one might be in dealing with strangers."

▮ Mr. Elgin requests leniency based on his son's illness and the resulting financial and emotional strain it imposed on him. It is true, as Mr. Elgin indicates in his brief, we noted in *Hutchinson, supra,* that the respondent's "disciplinary violations occurred at a time of marital crisis when he was emotionally dependent on his close friend. . . ." *Id.* at 925. However, the respondent in *Hutchinson* "was remorseful," *id.,* but on this record, Mr. Elgin's remorse is questionable. And, as we said in *In re Whitlock,* 441 A.2d 989, 992 (D.C. 1982), "while poor health, marital [or family] difficulties, and a heavy case load undoubtedly contributed to respondent's acts and omissions, they do not excuse respondent's conduct." In addition, Mr. Elgin failed to ask for *Kersey* mitigation, and even if he had, it is unlikely that we would have found a causal connection between his

dishonesty and the emotional and psychological strain he suffered as a result of his son's illness.[30] In *Lopes, supra,* 770 A.2d at 568–69, we said: "Dishonesty cuts away at the heart of the legal profession. We are not inclined to diminish the seriousness of the misconduct by relying on too tenuous a link between dishonesty and physical or psychological impairments." Therefore, while Mr. Elgin's preoccupation with and deep concern about his son's illness may weigh in his favor, we reject his view that his sanction should be public censure or a three-month suspension.

Mitigating factors, including Mr. Elgin's lack of a disciplinary record and his son's illness are counterbalanced by an insufficient showing of remorse and by his failure, at least as of the date of oral argument, to repay Ms. Burka the $5,000.00 (with interest) that he purportedly admits to owe her. Yet, these two mitigating factors merit some consideration and may suggest that a six-month suspension is not unreasonable or inappropriate in this case. Indeed, considering the standard by which we are bound, we cannot say on this record that a six-month sanction falls outside of "the wide range of acceptable outcomes," *Bingham, supra,* 881 A.2d at 623, or "would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted," D.C. Bar XI, § 9(g); *Bailey, supra,* 883 A.2d at 115. Furthermore, a six-month suspension, together with a requirement that Mr. Elgin pay Ms. Burka restitution in the amount of $5,000.00 as a condition of reinstatement, is consistent with the fact that " 'our purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney; rather, it is to

---

**30.** In order to qualify for a reduced sanction under the doctrine set forth in *In re Kersey,* 520 A.2d 321 (D.C.1987), one must demonstrate "a causal nexus ... between [a respondent's] [mental health] and the misconduct." *In re Lucy Edwards,* 870 A.2d 90, 96 (D.C. 2005).

offer the desired protection by assuring the continued or restored fitness of an attorney to practice law,'" *Bettis, supra,* 855 A.2d at 287 (quoting *Steele, supra,* 630 A.2d at 200). Therefore, based on the deference we owe to the Board's recommended sanction, we impose a six-month sanction and restitution of $5000.00, with interest, as a condition of reinstatement.

Accordingly, it is therefore ORDERED that Laurence A. Elgin is suspended from the practice of law in the District of Columbia for six months, with restitution to Ms. Burka of $5,000.00 plus interest at the legal rate of 6% from August 14, 1998, as a condition of reinstatement.[31]

*So ordered.*

---

31. We call Respondent's attention to the affidavit requirement set forth in D.C. Bar R. XI, § 14(g).